#29546, #29547-a-SRJ
**2021 S.D. 65**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

#29546

SHERIFF KEVIN THOM, In His
Official Capacity as Pennington County
Sheriff, and COLONEL RICK MILLER,
In His Official Capacity as Superintendent
of the South Dakota Highway Patrol,                    Plaintiffs and Appellees,

    v.

STEVE BARNETT, In His Official
Capacity as the South Dakota
Secretary of State,                                    Defendant,

    and

SOUTH DAKOTANS FOR BETTER
MARIJUANA LAWS, RANDOLPH
SEILER, WILLIAM STOCKER,
CHARLES PARKINSON, and
MELISSA MENTELE,                                       Defendants and Appellants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

#29547

IN THE MATTER OF ELECTION
CONTEST AS TO AMENDMENT A,
AN AMENDMENT TO THE SOUTH
DAKOTA CONSTITUTION TO
LEGALIZE, REGULATE, AND TAX
MARIJUANA; AND TO REQUIRE THE
LEGISLATURE TO PASS LAWS
REGARDING HEMP AS WELL AS LAWS
ENSURING ACCESS TO MARIJUANA FOR
MEDICAL USE.

* * * *

ARGUED
APRIL 28, 2021
REASSIGNED
SEPTEMBER 7, 2021
OPINION FILED **11/24/21**

* * * *

MATTHEW S. MCCAULLEY
LISA M. PROSTROLLO
CHRISTOPHER D. SOMMERS of
Redstone Law Firm, LLP
Sioux Falls, South Dakota

Attorneys for #29546, plaintiff and appellee and #29547, plaintiff and appellant Colonel Rick Miller.


ROBERT L. MORRIS
Belle Fourche, South Dakota

Attorney for #29546, plaintiff and appellee and #29547, plaintiff and appellant Sheriff Kevin Thom.


BRENDAN V. JOHNSON
TIMOTHY W. BILLION of
Robins Kaplan LLP
Sioux Falls, South Dakota

Attorneys for #29546, defendants and appellants and #29547, intervenors and appellees South Dakotans for Better Marijuana Laws, Randolph Seiler, William Stocker, Charles Parkinson, and Melissa Mentele.

JENSEN, Chief Justice (on reassignment).

[¶1.]  At the November 3, 2020 general election, South Dakota voters approved Initiated Constitutional Amendment A, titled by the Attorney General as: "An amendment to the South Dakota Constitution to legalize, regulate, and tax marijuana; and to require the Legislature to pass laws regarding hemp as well as laws ensuring access to marijuana for medical use." Following the election, Kevin Thom (Thom) and Rick Miller (Miller) filed a statutory election contest and a separate declaratory judgment action claiming Amendment A was presented to the voters in violation of the requirements for amendments to the South Dakota Constitution. The circuit court dismissed the election contest determining it was not an appropriate proceeding to challenge Amendment A. However, the court concluded in the declaratory judgment action that Amendment A was submitted to the voters in violation of the single subject requirement in the South Dakota Constitution Article XXIII, § 1 and that it separately violated Article XXIII, § 2 because it was a constitutional revision that should have been submitted to the voters through a constitutional convention. We affirm the circuit court's dismissal of the election contest and its determination that Amendment A violates Article XXIII, § 1.

<strong>Facts and Procedural History</strong>

[¶2.]  In May 2019, the prime sponsor of Amendment A submitted the original version of the Amendment to the director of the Legislative Research Council for review and comment as required by SDCL 12-13-25. The director's written comments were provided to the prime sponsor, the Attorney General, and

the Secretary of State. On August 16, 2019, the Attorney General delivered the final form of Amendment A and the Attorney General's statement of its title and explanation to the Secretary of State as required by SDCL 12-13-25.1. In the explanation, the Attorney General expressed the view that "[j]udicial clarification of the amendment may be necessary."

[¶3.] The sponsors of Amendment A submitted a petition to the Secretary of State seeking to place Amendment A on the ballot at the November 2020 general election. On January 6, 2020, the Secretary of State announced that he had validated that the petition contained a sufficient number of qualified voter signatures for Amendment A to be placed on the ballot in the next general election. The measure was titled "Constitutional Amendment A" and was placed on the 2020 general election ballot for consideration by the voters on November 3, 2020. Amendment A was approved by a majority vote, with 225,260 "Yes" votes (54.2%) and 190,477 "No" votes (45.8%).

[¶4.] On November 20, 2020, Thom, the duly-elected Sheriff of Pennington County, and Miller, the duly-appointed Superintendent of the South Dakota Highway Patrol, filed a statutory election contest in their individual and official capacities and a declaratory judgment action in their official capacities, against the Secretary of State. The Attorney General appeared in the circuit court on behalf of the Secretary of State pursuant to SDCL 1-11-1.[1] The circuit court granted South Dakotans for Better Marijuana Laws, Melissa Mentele, Charles Parkinson,

---

1. Although the Attorney General participated in the proceedings before the circuit court, he has not participated in either appeal.

Randolph Seiler, and William Stocker's (Proponents) unopposed motion to intervene. The circuit court approved by order the parties' stipulation to consolidate the election contest and declaratory judgment action. Thereafter, Thom and Miller filed a joint motion for summary judgment in both actions. The Attorney General and Proponents resisted summary judgment and filed a motion for judgment on the pleadings in each action.

[¶5.] The Attorney General and Proponents argued that an election contest was not the appropriate proceeding to challenge Amendment A because Thom and Miller did not assert that any irregularities occurred in the election process. Conversely, Thom and Miller asserted that an irregularity occurred because the placement of Amendment A on the ballot in violation of the Constitution tainted the entire election process and resulted in an election that was not a free and fair expression of the will of the voters.

[¶6.] In the declaratory judgment action, Proponents asserted that Thom and Miller lacked standing to challenge the constitutionality of Amendment A. They also argued that Thom and Miller were required to raise their challenge to the Amendment prior to its placement on the ballot and that the failure to do so precluded their post-election challenge. Finally, the Attorney General and Proponents asserted that Amendment A complied with the requirements in Article XXIII, § 1 and § 2 because Amendment A pertained to no more than one subject and amended rather than revised the Constitution.

[¶7.] Thom and Miller argued that Amendment A impermissibly attempted "to revise the Constitution through the initiative process" in violation of Article

XXIII, § 2 by adding an entirely new article to the South Dakota Constitution.[2]

They further asserted that the submission of Amendment A to the voters violated Article XXIII, § 1 because it embraced "at least five distinct general subjects[,]" including: (1) creating a right to grow, possess, and use a small amount of marijuana; (2) granting the Department of Revenue the power to promulgate rules regulating the sale and licensing of marijuana; (3) imposing an excise tax on the commercial sale of marijuana and directing how the revenue is appropriated; (4) requiring the Legislature to pass laws ensuring access to medical marijuana; and (5) requiring the Legislature to pass laws governing the cultivation, processing, and sale of hemp.[3]

[¶8.]     Following a hearing on the motions, the circuit court issued separate memorandum decisions granting Proponents' motion to dismiss the election contest but granting Thom and Miller's motion for summary judgment in the declaratory judgment action. The circuit court entered separate orders incorporating the memorandum decisions.

---

2.     Article XXIII, § 2 provides in relevant part that "[a] convention to revise this Constitution may be called by a three-fourths vote of all the members of each house."

3.     Article XXIII, § 1 provides in relevant part that:

> A proposed amendment may amend one or more articles and related subject matter in other articles as necessary to accomplish the objectives of the amendment; however, no proposed amendment may embrace more than one subject. If more than one amendment is submitted at the same election, each amendment shall be so prepared and distinguished that it can be voted upon separately.

[¶9.]	The court observed that "[t]he basic question in an election contest is whether the election, despite irregularities, resulted in a free and fair expression of the will of the voters." *See In re Election Contest as to Watertown Special Referendum Election of October 26, 1999*, 2001 S.D. 62, ¶ 7, 628 N.W.2d 336, 338. It then determined that Thom and Miller's "allegations are not related to the 'electoral process' surrounding the 2020 General Election as it relates to Amendment A." The court explained that Thom and Miller do not allege that any irregularities occurred during the election or show "anything suggesting the will of the voters was suppressed." Therefore, the court granted Proponents' motion for judgment on the pleadings, concluding that an election contest was not the appropriate action to resolve Thom and Miller's challenge to Amendment A.

[¶10.]	In its declaratory judgment ruling, the circuit court concluded that Thom and Miller had standing in their official capacities as the real parties in interest because each took an oath to uphold the South Dakota Constitution and Amendment A affected their ability to carry out their duties. The circuit court also concluded that Thom and Miller were not required to commence this action *prior* to the election.

[¶11.]	On the merits of Thom and Miller's challenge, the circuit court identified the "subject of Amendment A" as "the legalization of marijuana" and concluded that the "single scheme" of Amendment A is "being able to possess and use marijuana, as defined in § 1 of Amendment A, at any point from its growth through consumption" and includes the "[r]egulation of marijuana[.]" After examining the text of the Amendment, the court concluded that it contained an

additional, distinct subject—hemp. The court further determined that Amendment A contained provisions unrelated to the subject of legalizing marijuana. The court therefore held that Amendment A violated Article XXIII, § 1. Finally, the court determined that Amendment A was a revision requiring a constitutional convention under Article XXIII, § 2 because it "provides far-reaching changes to the nature of South Dakota's governmental plan[.]"

[¶12.] Thom and Miller appeal the circuit court's order dismissing the election contest, asserting that an election contest is a proper action to challenge the validity of the voter's adoption of Amendment A. Proponents appeal the circuit court's order declaring Amendment A unconstitutional, asserting the following issues: (1) Whether Thom and Miller have standing; (2) Whether the challenge to Amendment A could be brought after the election; and (3) Whether Amendment A contains multiple subjects in violation of Article XXIII, § 1.[4] We consolidated both appeals.

**Standard of Review**

[¶13.] This Court reviews "a ruling granting a judgment on the pleadings de novo." *Slota v. Imhoff & Assocs., P.C.*, 2020 S.D. 55, ¶ 12, 949 N.W.2d 869, 873. We similarly "review a circuit court's entry of summary judgment under the de novo standard of review." *Smith Angus Ranch, Inc. v. Hurst*, 2021 S.D. 40, ¶ 13, 962 N.W.2d 626, 629 (quoting *Estate of Stoebner v. Huether*, 2019 S.D. 58, ¶ 16, 935

---

4. Proponents also challenge the circuit court's determination that Amendment A is a revision requiring a constitutional convention under Article XXIII, § 2. Because we determine that Amendment A violates Article XXIII, § 1, it is unnecessary to address whether it violates Article XXIII, § 2.

N.W.2d 262, 266).  Issues of constitutional and statutory interpretation are also subject to de novo review.  *Jans v. S.D. Dep't of Pub. Safety*, 2021 S.D. 51, ¶ 10, 964 N.W.2d 749, 753 (quoting *In re Cleopatra Cameron Gift Tr., Dated May 26, 1998*, 2019 S.D. 35, ¶ 17, 931 N.W.2d 244, 249).  In de novo review, no deference is given to the circuit court's decision.  *Johnson v. United Parcel Serv.*, 2020 S.D. 39, ¶ 26, 946 N.W.2d 1, 8 (quoting *Zochert v. Protective Life Ins. Co.*, 2018 S.D. 84, ¶ 18, 921 N.W.2d 479, 486).

## Analysis

### *Whether the circuit court properly dismissed the election contest*

[¶14.]	An election contest is a "creature of statute."  *Warren v. Brown*, 57 S.D. 528, 234 N.W. 38, 41 (1930).  It is defined as "a legal proceeding, other than a recount, instituted to challenge the determination of any election under the provisions of this title, or any municipal, school, or township election."  SDCL 12-22-1.  This Court has explained that an election contest is a challenge of "the election *process* itself."  *In re Election Contest as to Watertown Special Referendum* (*Watertown Special Referendum II*), 2001 S.D. 62, ¶ 7, 628 N.W.2d 336, 338 (citation omitted) (emphasis added).  Therefore, a contestant must show voting irregularities and, further, that the irregularities were "so egregious that the will of the voters was suppressed."  *Id.*

[¶15.]	Here, Thom and Miller recognize that their election contest is not the typical challenge wherein a contestant asserts a violation of a statute governing the election process itself or a voting irregularity.  Nevertheless, they contend that their challenge is proper because, in their view, if this Court determines that Amendment

A violated Article XXIII, then the placement of Amendment A on the ballot was a voting irregularity. They further assert that if Amendment A embraces more than one subject and is a revision, "the election cannot be said to be a 'free and fair expression of the will of the voters.'" *See Watertown Special Referendum II*, 2001 S.D. 62, ¶ 7, 628 N.W.2d at 338.

[¶16.] Article XXIII, §§ 1 and 2 prescribe the means by which our Constitution may be amended or revised. While these constitutional provisions are mandatory, non-compliance with either provision does not mean that the *process* by which votes were cast was compromised or that a voting irregularity occurred. *See, e.g., In re Petition for Writ of Certiorari as to Determination of Election on Brookings Sch. Dist.'s Decision to Raise Additional Gen. Fund Prop. Tax Revenues*, 2002 S.D. 85, ¶ 14, 649 N.W.2d 581, 586 (observing that the root of the problem related to the validity of ballots not "the validity of the election process itself"). Other than alleging violations of Article XXIII, §§ 1 and 2, Thom and Miller have not identified any irregularity in the election process caused by a violation of an election law. *See Watertown Special Referendum II*, 2001 S.D. 62, ¶ 8, 628 N.W.2d at 338–39 (rejecting contestants' claim that long lines to vote constituted a voting irregularity when contestants presented no "proof of a violation of a state or local election law"). Therefore, the circuit court properly dismissed Thom and Miller's election contest.

***Whether Thom and Miller have standing***

[¶17.] Proponents contend the circuit court erred in finding that Thom has standing to sue the State in his official capacity because, in their view, the law is well settled that a county (and therefore a county official) cannot sue the State.

They also contend that even if Thom could bring suit, he "did not plead or prove any legally-protected interest to or adversarial relationship in this lawsuit related to his official capacity." They similarly argue that Miller cannot sue the State in his official capacity because the Highway Patrol is a subordinate agency of the State and Miller has failed to identify that "the Highway Patrol will suffer a direct, material harm to a legally-protected right[.]"

[¶18.] Thom asserts that he "has standing to bring to the attention of the Court" the rules governing how constitutional amendments are to be submitted, "which the Proponents of Amendment A violated in submitting Amendment A to the voters." In his view, "standing is conferred upon him in his official capacity as Sheriff, due to his oath of office" and because of the statutory requirement "that he keep and preserve the peace in Pennington County." For his part, Miller alleges that he has standing in his official capacity "because Amendment A will have a direct and injurious effect on the Highway Patrol" by divesting authority from the Highway Patrol and transferring it to the Department of Revenue. He also claims that he has a substantial and real interest in this action because he took an oath to support the South Dakota Constitution.

[¶19.] This Court has not directly examined whether a public official has standing to challenge the constitutionality of a law. Generally, "to establish standing in a declaratory judgment action[,] the plaintiff must have 'personally . . . suffered some actual or threatened injury as the result of the putatively illegal conduct of the defendant.'" *Abata v. Pennington Cnty. Bd. of Comm'rs*, 2019 S.D. 39, ¶ 12, 931 N.W.2d 714, 719 (quoting *Benson v. State*, 2006 S.D. 8, ¶ 22, 710

N.W.2d 131, 141). "Whether a party has standing is a legal conclusion, which we review under the de novo standard." *Lewis & Clark Rural Water Sys., Inc. v. Seeba*, 2006 S.D. 7, ¶ 38, 709 N.W.2d 824, 836.

[¶20.] In *Edgemont School Dist. 23-1 v. South Dakota Department of Revenue*, we examined whether a school district and county could challenge the constitutionality of a statute that authorized the Department of Revenue to apportion the assessed value of a railroad line among the various counties through which the track ran. 1999 S.D. 48, ¶ 4, 593 N.W.2d 36, 38. The Court identified that "[p]olitical subdivisions of states—such as counties . . . are not sovereign entities; they are subordinate governmental instrumentalities created by the state to assist in carrying out state governmental functions." *Id.* ¶ 14, 593 N.W.2d at 40 (citation omitted). Citing cases from other jurisdictions, the Court determined that the district and counties, as "creations of the legislature[,]" did not have "standing to challenge the constitutionality" of a statute. *Id.* ¶ 15. This is because "they exist by reason of statutes enacted within the power of the Legislature," and there is "no sound basis upon which a ministerial (or, for that matter, any other) office may question the laws of its being." *Id.* (quoting *Bd. of Supervisors of Linn Cnty. v. Dep't of Rev.*, 263 N.W.2d 227, 234 (Iowa 1978) (addressing standing by a county or a county auditor to challenge the constitutionality of newly amended statutes)).

[¶21.] Here, neither Thom nor Miller have identified that they have suffered some actual or threatened injury as a result of Amendment A. While they both contend that Amendment A impacts their official duties, an official's performance of his or her duties "does not affect the personal or property rights of these officials."

*See State v. Steele Cnty. Bd. of Comm'rs*, 232 N.W. 737, 738 (Minn. 1930). Thom and Miller, in their official capacities, also "have no interest in defeating the purpose of the law" because "[t]hey can suffer no injury by carrying out [its] mandate" and "[n]o violation of duty can be imputed to them by reason of their compl[iance]." *See id.* Moreover, although Thom and Miller argue that their oaths to uphold the Constitution required them to file this challenge because they believe that Amendment A was submitted to the voters in violation of the Constitution, taking an oath to uphold the Constitution "does not require [the official] to obey the Constitution as he decides, but as judicially determined." *See Charles Hewitt & Sons v. Keller*, 275 N.W. 94, 96 (Iowa 1937).

[¶22.] As the Minnesota Supreme Court observed, "[t]o permit officials charged with such a duty to raise such a question may not only be a hazardous proceeding to themselves but productive of great inconvenience to the public." *Steele Cnty. Bd. of Comm'rs*, 232 N.W. at 738. For these reasons, we conclude that Thom and Miller do not have standing in their official capacities to bring this declaratory judgment action challenging Amendment A.

[¶23.] However, Miller alternatively contends that even if he lacks standing, dismissal of the declaratory judgment action would be improper because the Governor is the real party in interest and she ratified the commencement of this lawsuit through an executive order. Proponents respond that the Governor "cannot cloak Miller with standing." They also contend that the executive order is "a transparent effort to avoid the clear consequences" of Miller's failure to establish standing.

[¶24.] On January 8, 2021, the Governor filed Executive Order 2021-02 with the Secretary of State, noting that her "oath to support and defend the Constitution means ensuring that the Constitution is not violated . . . ." She then asserted that the placement of "Amendment A on the ballot was not proper and violated the procedures set forth in the South Dakota Constitution" and that "upon [her] prior instruction, Colonel Rick Miller" commenced the litigation at issue. She concluded by "order[ing] and declar[ing]" that:

> 1. Commencement of the Amendment A Litigation is consistent with my executive power, described in Article IV Section 3[5] of the South Dakota Constitution, which I may properly delegate.
>
> 2. On November 20, 2020, I directed Colonel Rick Miller to commence the Amendment A Litigation on my behalf in his official capacity. At all times thereafter, Colonel Rick Miller has acted as petitioner and plaintiff in the Amendment A Litigation under my direction and pursuant to a delegation of my Constitutional authority under Article IV, Section 3.
>
> 3. Pursuant to SDCL 15-6-17(a), the commencement and continued prosecution of the Amendment A Litigation is hereby ratified and affirmed in all respects.

[¶25.] It is well settled that "[e]very action shall be prosecuted in the name of the real party in interest." SDCL 15-6-17(a). However, SDCL 15-6-17(a) further provides that "[n]o action shall be dismissed on the ground that it is not prosecuted

---

5. Article IV, § 3 of the South Dakota Constitution provides in relevant part:

> The Governor shall be responsible for the faithful execution of the law. [She] may, by appropriate action or proceeding brought in the name of the state, enforce compliance with any constitutional or legislative mandate, or restrain violation of any constitutional or legislative power, duty or right by any officer, department or agency of the state or any of its civil divisions.

in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest." We have explained that "[t]he purpose of the real party in interest provision is to assure that a defendant is required only to defend an action brought by a proper party plaintiff and that such an action must be defended only once." *Ellingson v. Ammann*, 2013 S.D. 32, ¶ 6, 830 N.W.2d 99, 101 (quoting *Biegler v. Am. Fam. Mut'l Ins. Co.*, 2001 S.D. 13, ¶ 27, 621 N.W.2d 592, 600).

[¶26.] This Court has not previously examined the ratification language in SDCL 15-6-17(a). However, our rule is patterned after Federal Rule of Civil Procedure 17(a), and multiple federal courts have examined the requirements for ratification of an action by the real party in interest. *See generally Nooney v. StubHub, Inc.*, 2015 S.D. 102, ¶ 8 n.1, 873 N.W.2d 497, 499 n.1 (explaining that it is appropriate to be guided by federal court decisions interpreting and applying similar federal rules of civil procedure). As one court observed, "[r]atification, though rare, is an entirely proper method of resolving controversies over real parties in interest." *Clarkson Co. Ltd. v. Rockwell Int'l Corp.*, 441 F. Supp. 792, 797 (N.D. Cal. 1977). Ratification is designed to prevent forfeiture of an action when such forfeiture would be unjust. *See, e.g., Sun Refining & Marketing Co. v. Goldstein Oil Co.*, 801 F.2d 343, 345 (8th Cir. 1986) (allowing ratification after judgment was entered to prevent injustice); *see also Wieburg v. GTE Sw., Inc.*, 272

F.3d 302, 309 (5th Cir. 2001); *Putzier v. Ace Hardware Corp.*, 50 F. Supp. 3d 964, 984 (N.D. Ill. 2014).

[¶27.]    In examining whether "[a] proper ratification under Rule 17(a)" exists, the Third Circuit Court of Appeals identified two elements, namely that the ratifying party must "(1) authorize continuation of the action and (2) agree to be bound by its result." *ICON Grp., Inc. v. Mahogany Run Dev. Corp.*, 829 F.2d 473, 478 (3d Cir. 1987). *See also Motta v. Res. Shipping & Enters. Co.*, 499 F. Supp. 1365, 1371 (S.D.N.Y. 1980) (observing that "[a] letter or document that ratifies the commencement and continuation of an action may be sufficient to cure any real party in interest defects in the suit"). Courts also consider whether the defendant would be prejudiced by ratification. *See Sun Refining*, 801 F.2d at 345; *Motta*, 499 F. Supp. at 1373.

[¶28.]    Here, the Executive Order makes clear that the Governor intended to challenge Amendment A by her authority in Article IV, § 3 of the Constitution, that she authorized the suit filed by Miller, desired that it continue, and affirmed it in all respects. The Executive Order does not specifically state that the Governor agrees to be bound by the final determination in the case. However, the Order ratifies and affirms the action "[p]ursuant to SDCL 15-6-17(a)" "in all respects[,]" and this language indicates the Governor's intent to be bound by the result of this action. *See Aquila, LLC v. City of Bangor*, 640 F. Supp. 2d 92, 101 (D. Maine 2009) (construing document to satisfy requirements of ratification although key words were not used).

[¶29.] Moreover, although Proponents resisted ratification below and again on appeal, they have not claimed that prejudice would result if ratification were permitted. *See Aquila, LLC*, 640 F. Supp. 2d at 102 (noting that no prejudice results when ratification "seems to inure to [the defendant's] benefit by avoiding sequential litigation on essentially the same claim"). They also fail to identify any defense they would be unable to assert due to ratification. *See Motta*, 499 F. Supp. at 1374 (noting that "an important function of the real party in interest rule is to enable the defendant to present all the defenses he has against the party entitled to pursue the claim").

[¶30.] Instead, Proponents argue that the "ratification argument misses the point." In their view, the Executive Order impermissibly *delegated* to Miller the Governor's constitutional power to bring suit. They further assert that "[i]f this is indeed a lawsuit brought by" the Governor, "she should have brought it" in the name of the State. Proponents' claim that the action was improperly captioned elevates form over substance. Regardless of the caption, the Governor's ratification of the action in her official capacity authorized the suit under the authority granted to the Governor under Article IV, § 3 of the Constitution. Further, Proponents' improper delegation argument fails because the Governor, as a real party in interest, has standing to commence or *ratify* the commencement of this action under SDCL 15-6-17(a). *See Arnoldy v. Mahoney*, 2010 S.D. 89, ¶ 19, 791 N.W.2d 645, 653 ("Standing is established [under SDCL 15-6-17(a)] through being a 'real party in interest.'" (citation omitted)).

[¶31.]    Ratification under SDCL 15-6-17(a) has "the same effect as if the action had been commenced in the name of the real party in interest." Thus, the Executive Order *ratified* Miller's prosecution of this suit as if *the Governor* had commenced it herself. "Formal joinder or substitution of the real party in interest will not be necessary when the real party ratifies the commencement of the action." *See* 6A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1555 (3d ed. 1990); *see also Am. Legend Coop. v. Top Lot Farms, Inc.*, No. 4:18-CV-04064-KES, 2020 WL 4540598 at *4 (D. S.D. Aug. 6, 2020) (concluding that joinder or substitution of the real party in interest was unnecessary in light of ratification).

[¶32.]    While Thom and Miller lacked standing to commence this action, our conclusion that the Governor ratified the prosecution of the action and is bound by the outcome of this litigation cures any standing defect. Therefore, we affirm the circuit court's decision to deny Proponents' motion to dismiss the action due to a lack of standing. *See Rawoof v. Texor Petroleum Co., Inc.*, 521 F.3d 750, 759 (7th Cir. 2008) (observing "that ratification is a legitimate way to cure an initial failure to prosecute an action in the name of the real party in interest under" the federal rule); *Digizip.com, Inc. v. Verizon Servs. Corp.*, 139 F. Supp. 3d 670, 677 (S.D.N.Y. 2015) (same); *Martin v. China Manf. All., LLC*, No. 11-CV-0711-MJR-PMF, 2013 WL 12051729 (S.D. Ill.) (same).[6]

---

6.    Because we conclude that the Governor ratified the declaratory judgment action, we decline to address Thom and Miller's alternative argument that this Court could "dispense with the technical requirements of standing" because "the case presents a question of great public importance."

***Whether the challenge to Amendment A could be brought after the election***

[¶33.] Proponents contend that this declaratory judgment action is untimely because the Governor, as well as Thom and Miller, could have pursued a pre-election challenge to Amendment A. According to Proponents, Thom and Miller could have challenged the Secretary of State's decision to place Amendment A on the ballot under SDCL 2-1-17.1 or SDCL 2-1-18, or sought injunctive relief "preventing the Secretary of State from placing Amendment A on the ballot." They also contend that the Governor should have asked this Court to issue an advisory opinion on the constitutionality of Amendment A. Finally, Proponents argue that we should apply principles of waiver and laches to this post-election challenge.

[¶34.] The authorities cited by Proponents to support their claim of waiver and laches all involved challenges based upon procedural irregularities in the election process. Proponents have not cited any cases where the doctrines of waiver and laches have been applied to post-election challenges based upon the single subject or separate vote requirements of a state constitution. Further, Proponents' identification of other legal remedies that may have been available before the election does not mean these remedies were exclusive. "The existence of another adequate remedy does not preclude a judgment for declaratory relief[.]" *See* SDCL 15-6-57. Finally, we have previously considered post-election challenges where the defects were known and could have been addressed before the election. *See Bienert v. Yankton Sch. Dist.*, 507 N.W.2d 88 (S.D. 1993); *Barnhart v. Herseth*, 88 S.D. 503, 222 N.W.2d 131 (1974). We therefore reject Proponents' claim that this action is untimely.

***Whether Amendment A violates Article XXIII, § 1***

[¶35.]     Article XXIII, § 1 of the South Dakota Constitution allows

constitutional amendments to be proposed to the voters by citizen initiative or by a

majority vote of the Legislature.  The power of the people to propose amendments

by initiative, however, is not without limits.  Article XXIII, § 1 provides in relevant

part that "*no proposed amendment may embrace more than one subject*" and "[i]f

more than one amendment is submitted at the same election, *each amendment shall

be* so prepared and distinguished that it can *be voted upon separately*."  (Emphasis

added.)[7]

[¶36.]     At statehood, Article XXIII, § 1 required a separate vote on each

proposed amendment, similar to the existing separate vote requirement.  This

Court interpreted the separate vote language to mean that a proposed amendment

submitted to the voters that includes multiple, unrelated subjects violates Article

XXIII, § 1.[8]  *See State ex rel. Adams v. Herried*, 10 S.D. 109, 72 N.W. 93 (1897)

---

7.     The dissent relies heavily on a sentence in *Barnhart* stating there is a "strong
        presumption of constitutionality after adoption by the people[.]"  88 S.D. at
        512, 222 N.W.2d at 136.  However, the dissent's application of this judicially
        created presumption essentially reads the single subject and separate vote
        requirements out of Article XXIII, § 1, and in any event, the presumption
        fails to state a standard for determining compliance with Article XXIII, § 1.

8.     In 1889, Article XXIII, § 1 provided in relevant part that amendments to the
        Constitution may be proposed; however, "if more than one amendment be
        submitted, they shall be submitted in such manner that the people may vote
        for or against such amendments separately."  Section 1 was not amended
        until 1972, after the voters approved a change as part of an overall
        amendment to Article XXIII proposed by a Constitutional Revision
        Commission.  S.D. Const. art. XXIII, § 1, Historical Notes.  The amendment
        omitted the requirement of separate votes when more than one amendment is
        submitted, and added a new sentence, namely that "[a] proposed amendment

                                                                  (continued . . .)

(considering a proposed amendment to the constitution changing the number and powers of regents and abolishing the trustees of state educational institutions). In 2018, South Dakota voters approved an amendment to Article XXIII, § 1 that included the separate vote requirement and added language prohibiting proposed amendments from embracing "more than one subject[.]" While this Court has not yet examined the single subject language added in 2018, the *Herried* Court's decision is instructive and controlling because the 2018 amendment in effect ratified the rationale in *Herried* that when a proposed amendment embraces more than one subject with different objects or purposes, each discrete subject must be voted on separately by the electorate.[9]

[¶37.]     This Court long ago emphasized the significance of the constitutional requirement ensuring voters are afforded an opportunity to vote separately on each separate subject contained in a proposed amendment. "[I]t is hardly necessary to point out that the provision of the constitution requiring that amendments shall be so presented to the electors that they may vote upon each separately is one of the

_____

(. . . continued)
    may amend one or more articles and related subject matter in other articles
    as necessary to accomplish the objectives of the amendment."

9.    This is not to say that the single subject and separate vote requirements
    mean the same thing. Rather, we read the current single subject and
    separate vote requirements in Article XXIII, § 1 to work in tandem to ensure
    voters are able to cast a separate vote on separate subjects and amendments.
    Thus, if an amendment embraces more than one subject, it violates the single
    subject requirement. Likewise, if that amendment was submitted to the
    voters as one amendment, it violates the separate vote requirement. As one
    court has explained concerning the single subject and separate vote
    requirements, "[b]oth serve to ensure that the voters will not be compelled to
    vote upon multiple 'subjects' or multiple constitutional changes in a single
    vote." *Armatta v. Kitzhaber*, 959 P.2d 49, 63 (Or. 1998).

utmost importance, and one of substantial merit." *Herried*, 10 S.D. 109, 72 N.W. at 97.

[¶38.] Applying the separate vote requirement contained in Article XXIII, § 1 at the time, the *Herried* Court found persuasive the analysis by the Wisconsin Supreme Court in *State ex rel. Hudd v. Timme*, 11 N.W. 785, 791 (Wis. 1882). *Herried*, 10 S.D. 109, 72 N.W. at 97. The Wisconsin court determined that the same language in the Wisconsin constitution required amendments to be submitted separately for consideration by the voters when the propositions submitted had "different objects and purposes in view[.]" *Id.* (quoting *Timme*, 11 N.W. at 791). However, the Court explained that the constitution did not require the submission, "as separate amendments, the separate propositions necessary to accomplish a single purpose." *Id.* (quoting *Timme*, 11 N.W. at 791). *Herried* then adopted a three-part test from *Timme*: "[i]n order to constitute more than one amendment [and thus violate § 1], the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes, [that are] not dependent upon or connected with each other." *Id.* (quoting *Timme*, 11 N.W. at 791).

[¶39.] Applying the Wisconsin court's test to the challenged amendment in *Herried*, the Court observed that the title of the amendment "would seem to indicate that the legislature regarded it as embracing more than one amendment[.]" *Id.* It also observed that the provisions abolishing the trustees and changing the number and powers of the regents could have been adopted independently of each

other.  However, the Court noted that the critical inquiry is whether "as a matter of law, but one amendment is included[.]"  *Id.*

[¶40.]		The Court then identified that the purpose or object of the proposed amendment was "to place" state educational institutions "under the control of a single board."  *Id.*  In the Court's view, "[t]he membership of such board, its powers, and the abolition of the local boards, are but incidental to and necessarily connected with the object intended."  *Id.*  The Court therefore concluded that "only one amendment was submitted."  *Id.*  The Court also noted "the well-recognized rule" that when the constitutionality of an amendment is called into question, it will be sustained if "it does not plainly and palpably appear to be invalid."  *Id.*

[¶41.]		This Court applied *Herried* in *Barnhart* when considering whether an amendment proposed by a constitutional revision commission and approved by the Legislature for submission to the voters that made more than 20 changes to offices and departments in the executive branch was submitted to the voters in violation of Article XXIII, § 1.  88 S.D. at 510, 222 N.W.2d at 135.  The Court detailed the legislative history surrounding the proposed amendment, noting that before the Legislature approved submission of the amendment to the voters, input had been "received from every department of government affected by this amendment; by any and all business and civic groups having an interest; and by all individuals who wished to appear and be heard."  *Id.* at 508, 222 N.W.2d at 134.  Then the Court in *Barnhart* identified that the purpose of the amendment "was to engender greater efficiency and responsibility in the executive branch of state government by gathering a multitude of independent boards and commissions under the control of

the governor, and to eliminate unnecessary offices and burdensome restrictions on remaining offices." *Id.* at 510, 222 N.W.2d at 135. Ultimately, the Court concluded that the provisions of the proposed amendment are "incidental to and necessarily connected with the object intended."[10] *Id.* at 511, 222 N.W.2d at 135 (quoting *Herried*, 10 S.D. 109, 72 N.W. at 97).

[¶42.] Here, the circuit court did not apply the three-part test from *Herried*. Rather, it applied a "reasonably germane" standard adopted by this Court in *Baker v. Atkinson*, 2001 S.D. 49, ¶ 25, 625 N.W.2d 265, 273. Thom and Miller contend that this more deferential standard from *Baker* is inapplicable to the question whether an amendment to the constitution violates the single subject and separate vote requirements found in Article XXIII, § 1. Proponents, in contrast, contend the circuit court correctly determined that the reasonably germane test applies when a constitutional amendment is challenged under Article XXIII, § 1.

---

10. Although the Court in *Barnhart* applied the test from *Herried*, it also looked to decisions from other courts for confirmation that the particular amendment did not violate Article XXIII, § 1. 88 S.D. at 511–12, 222 N.W.2d at 135–36 (citing *Fugina v. Donovan*, 104 N.W.2d 911 (Minn. 1960); *Keenan v. Price*, 195 P.2d 663, 678, 681 (Idaho 1948)). The Minnesota and Idaho courts, similar to *Herried*, quoted the test from the Wisconsin Supreme Court in *Timme*, 11 N.W. at 785. However, the Minnesota and Idaho courts also considered whether the provisions of the challenged amendment were *rationally related* to the overall object or purpose of the amendment. Drawing from these two cases, the Court in *Barnhart* reiterated that the proposed amendment did not violate § 1 because "the matters contained in the challenged amendment *rationally relate* to the overall plan of making the executive branch of state government more efficient and responsible." *Id.* at 512, 222 N.W.2d at 136 (emphasis added). However, *Barnhart* was not critical of the decision or analysis in *Herried*, and we conclude that the rationally related language from *Barnhart* does not supplant the three-part test adopted in *Herried*.

[¶43.] *Baker* did not involve a proposed constitutional amendment; rather, the issue concerned a referendum petition seeking to challenge certain Lawrence County ordinances and resolutions approving a change of zoning. *See* 2001 S.D. 49, ¶ 21, 625 N.W.2d at 272. More importantly, the Court in *Baker* interpreted a different single subject provision (S.D. Const. art. III, § 21) governing legislative enactments, which does not contain a separate vote requirement. The Court specifically observed that the single subject rule under Article III, § 21, concerning legislative enactments, is to "be construed liberally to uphold proper legislation, all parts which are reasonably germane."[11] *Baker*, 2001 S.D. 49, ¶ 25, 625 N.W.2d at 273 (citation omitted) (emphasis omitted).

[¶44.] The single subject and separate vote requirements of Article XXIII, § 1, in contrast, demand more than Article III, § 21. As the Court in *Herried* explained, the protections afforded by Article XXIII, § 1 are "more forceful when considered in connection with the action of electors upon proposed constitutional amendments than when considered in connection with the actions of legislators." 10 S.D. 109, 72 N.W. at 96. This is because "[i]n the legislature each member has an opportunity to offer amendments, and thus record his dissent to the objectionable features of any pending measure[,]" whereas the elector "must either ratify or reject the entire proposition as presented." *Id.*

---

11. Under Article III, § 21, "[n]o law shall embrace more than one subject, which shall be expressed in its title." Because the matter concerned local legislation by a county, the Court also applied SDCL 7-18A-3, which provides that "[a]n ordinance shall embrace only one subject, which shall be expressed in its title."

[¶45.]     Other courts have applied an approach similar to *Herried* when considering the single subject or separate vote requirements for constitutional amendments as compared to legislative actions. "The process [of amending the constitution] is appropriately more complex than simple lawmaking and, most important, requires participation by [ ] voters." *Cambria v. Soaries*, 776 A.2d 754, 764 (N.J. 2001). "[B]ecause the separate-vote requirement is concerned *only* with a change to the fundamental law, the notion that the people should be able to vote separately upon each separate amendment should come as no surprise. In short, the requirement serves as a safeguard that is fundamental to the concept of a constitution." *Armatta*, 959 P.2d at 63. Thus, we conclude that the reasonably germane test from *Baker* does not apply to the requirements in Article XXIII, § 1 for constitutional amendments.

[¶46.]     Applying *Herried* and *Barnhart*, here, we start by identifying the object or purpose of Amendment A. According to Proponents, the object or purpose of Amendment A is "the legalization and regulation of marijuana, including its recreational, medical, and agricultural uses." They argue that every part within Amendment A is reasonably germane to this purpose. Miller, in contrast, asserts that the purpose is to legalize the possession and ingestion of small amounts of "marijuana" as that term is defined in Amendment A, and that the Amendment embraces other unconnected subjects with different objects or purposes in view. The circuit court determined that "[t]he subject of Amendment A is: the legalization

of marijuana" and that the hemp provision pertains to a distinct subject not connected to the legalization of marijuana.[12]

[¶47.]     Importantly, any statement of the object or purpose of Amendment A divorced from a review of the provisions contained therein and their connectedness to one another runs the risk of defining the object or purpose based on various policy objectives sought to be attained by the drafters of this Amendment.  It also runs the risk of defining the object or purpose too narrowly or too broadly.  Indeed, Article XXIII, § 1 is not violated simply because a proposed amendment includes multiple provisions.  Rather, a violation occurs when the proposed amendment contains more than one subject, with different objects or purposes, that are not dependent upon or connected with each other.

[¶48.]     Amendment A as submitted to the voters proposed the addition of at least nine different provisions to the Constitution.  These included: (1) creating a constitutional right for individuals at least 21 years of age to possess and use certain quantities of marijuana; (2) regulating the planting, cultivating, harvesting, drying, processing, and manufacturing of marijuana for use by individuals at least 21 years of age; (3) creating civil penalties for individuals that violate the provisions in Amendment A; (4) making the South Dakota Department of Revenue responsible for the regulation and oversight of the production, sale, and possession of marijuana for individuals at least 21 years of age; (5) creating statewide regulation of the

12.     The circuit court concluded there were at least three additional subjects that in the court's view were not related to the purpose of Amendment A—the setting of civil penalties for violations of certain provisions in the amendment, the discipline of those holding professional or occupational licenses, and taxation—and suggested there may be more.

licensing of producers, manufacturers, and sellers of marijuana to individuals at least 21 years of age; (6) authorizing local regulation of the commercial sale and distribution of marijuana for individuals at least 21 years of age and regulation to allow individuals at least 21 years of age to cultivate marijuana at a private residence; (7) establishing the taxation of marijuana sold to individuals at least 21 years of age; (8) mandating the Legislature to enact legislation by April 1, 2022, to "[e]nsure access to marijuana beyond what is set forth in this article by persons who have been diagnosed by a health care provider, acting within the provider's scope of practice, as having a serious and debilitating medical condition and who are likely to receive therapeutic or palliative benefit from marijuana;" and (9) mandating the Legislature to enact legislation by April 1, 2022, to "[r]egulate the cultivation, processing, and sale of hemp."

[¶49.]     While the provisions of Amendment A included proposals impacting various individuals, agencies, and levels of government, this does not resolve the question whether there is a violation of the single subject and separate vote requirements in Article XXIII, § 1. As we stated in *Herried*, an amendment including multiple proposals, that could have been presented separately does not violate the Constitution if "the separate propositions [are] necessary to accomplish a single purpose." 10 S.D. 109, 72 N.W. at 97 (quoting *Timme*, 11 N.W. at 791). This Court also warned against focusing on the different proposals in an amendment in isolation because such a view improperly "substitut[es] for the real object or purpose [of the amendment] one of its incidents." *Id.* Thus, if multiple proposals "may be logically viewed as parts or aspects of a single plan, then the constitutional

requirement is met in their submission as one amendment." *Barnhart*, 88 S.D. at 512, 222 N.W.2d at 136 (citation omitted).

[¶50.]     It is clear that Amendment A contains provisions embracing at least three separate subjects, each with distinct objects or purposes. Those three separate subjects are: (1) the development of a comprehensive plan for the legalization and regulation of marijuana for all individuals at least 21 years of age; (2) a mandate that the Legislature adopt laws ensuring a discrete group of qualifying persons, without regard to age, have access to medical marijuana; and (3) a mandate that the Legislature regulate the cultivation, processing, and sale of hemp.[13] Significantly, the dissent concedes that these three identified subjects in Amendment A have separate objects or purposes.[14] However, the dissent concludes that these different subjects are connected because Amendment A "was intended to provide a comprehensive plan for all phases of legalization, regulation, use, production, and sale of marijuana and related substances." *See* Dissent ¶ 88. But the dissent—after acknowledging that recreational marijuana, medical marijuana, and hemp have separate objects and purposes—fails to explain how the propositions

---

13.  Laws regulating hemp in South Dakota were passed by the Legislature in March 2020, after Amendment A was certified, but before the voters considered Amendment A in November 2020. *See* SDCL ch. 38-35. The voters also approved an initiated measure (IM 26) approving medicinal marijuana in the November 2020 election. Today's decision does not concern either the passing of laws regulating hemp or the adoption of the initiated measure.

14.  The dissent states that the majority "sifts through the propositions in Amendment A on recreational marijuana, medical marijuana, and hemp, *identifies only their separate objects or purposes*, and concludes that the amendment contains three separate subjects." *See* Dissent ¶ 94 (emphasis added).

on medical marijuana and hemp are incidental to and necessarily connected with each other or with the legalization of recreational marijuana in South Dakota, as required by Article XXIII, § 1.

[¶51.]     The first 13 sections of Amendment A stand alone as a comprehensive plan for the legalization of, regulation of, and access to marijuana for *all* individuals at least 21 years of age. These provisions are dependent upon or connected with one another in order to accomplish this single purpose of legalizing marijuana for all individuals at least 21 years of age.[15] For instance, the constitutional right created for individuals of age to possess and use marijuana would be virtually meaningless in the absence of facilities in the State that are able to produce, manufacture, and sell marijuana products to these individuals. Similarly, the regulation and oversight of a product that has psychoactive ingredients is undoubtedly connected to its legalization.[16]

---

15.    The taxation of recreational marijuana presents a close question as to whether the revenue generated from a fifteen percent tax on the sale of marijuana has the same object and purpose as the legalization and regulation of recreational marijuana. Miller suggests that the provisions involving the taxation of marijuana involves a separate subject, but he has not developed his arguments on this issue. While there may be costs associated with the governmental regulation of recreational marijuana, it is unclear whether the amount of tax and associated revenue is dependent upon or connected with the legalization and regulation of recreational marijuana. Because we conclude that Amendment A embraces three different subjects with unconnected objects or purposes, we express no opinion on the question whether the taxation provisions relate to a subject separate than and distinct from the legalization and regulation of marijuana for all individuals at least 21 years of age.

16.    As an example, alcohol is also considered a psychoactive drug. An entire Title of the South Dakota Code contains legislation regulating alcoholic

(continued . . .)

[¶52.]       In contrast, the provision in § 14 relating to medical marijuana has the distinct object or purpose of ensuring access to marijuana *solely* for therapeutic and palliative health care for certain individuals.  Amendment A mandates legislation to ensure access to marijuana for medical purposes "*beyond* what is set forth in" the Amendment.  *See* § 14(a) (emphasis added).  By this plain language the drafters of Amendment A acknowledged that the medical marijuana provision is unconnected to the provisions legalizing marijuana for all persons at least 21 years of age.  Indeed, unlike the sections providing for legalization and regulation of and access to marijuana for *all* persons at least 21 years of age, § 14(a) only applies to a limited group of individuals, without age restriction: (1) who have been diagnosed by a health care provider; (2) with a serious and debilitating medical condition; and (3) are likely to receive therapeutic or palliative benefit from marijuana.  Therefore, the limited object or purpose of legalizing marijuana solely for medical purposes is not dependent upon or connected to the broad legalization of recreational marijuana found in the first 13 sections of Amendment A and it is also not dependent upon or connected with the mandate related to hemp in § 14(b).

[¶53.]       The constitutional mandate in § 14(b) requiring legislation to provide for "the cultivation, processing, and sale of hemp" has the distinct object or purpose of allowing industrial and agricultural use of a product that contains essentially no psychoactive properties.  Hemp, by the definition in Amendment A, is restricted to "a delta-9 tetrahydrocannabinol concentration of not more than three-tenths of one

---

(. . . continued)

   beverages in the State.  *See* SDCL Title 35.  Within Title 35 there are 20
   chapters dedicated to the regulation of alcohol.

percent on a dry weight basis." In contrast, there is no fixed maximum level of psychoactive properties for marijuana in Amendment A. Tellingly, Proponents claim the subject of Amendment A is the legalization of marijuana, including its *agricultural use*, but the definition of "marijuana" in Amendment A specifically excludes hemp.

[¶54.] Nevertheless, Proponents and the dissent argue that the legalization and regulation of recreational marijuana, medical marijuana, and hemp all relate to a single subject because of their shared biological origin from the cannabis plant and a common plan to comprehensively regulate all products produced by a cannabis plant. But Amendment A does not provide a comprehensive plan to regulate all products from the cannabis plant. It provides a comprehensive plan for the legalization and regulation of recreational marijuana, and then separately mandates legislative action to ensure access to medical marijuana and regulation of the cultivation, processing, and sale of hemp. In suggesting that their biological origins create a sufficient connection between marijuana and hemp, the dissent ignores that Amendment A separately defines marijuana and hemp.[17] Further, the

---

17. The dissent argues that Congress's decision to regulate both marijuana (spelled "marihuana" in the Act) and hemp together in 1937 somehow created a connection between the different substances for the purpose of considering Amendment A. *See* Marihuana Tax Act of 1937 (repealed by Congress in 1970, which adopted the Controlled Substances Act, 84 Stat. 1242, codified at 21 U.S.C. § 801 *et seq.* (2012), and retaining the same definition of hemp and marihuana). But the plain language of Amendment A distinguishes hemp from marijuana and separately defines it as a product containing negligible levels of the psychoactive compound. Moreover, Congress amended the federal statute in 2018, prior to the time Amendment A was proposed, to define marihuana and hemp separately and identical to the definition of hemp in Amendment A. *See* 21 U.S.C. § 802(16)(B) (2018) (providing that the

(continued . . .)

single subject and separate vote requirements and the necessary connectedness under *Herried* and *Barnhart* require more than a consideration of the biological origins of the products at issue in Amendment A.[18]  To conclude otherwise and treat the regulation of products with a shared biological origin as having the same object or purpose would extend Amendment A into abstraction and obviate the purpose for which Article XXIII, § 1 was adopted.

[¶55.]     In determining that Amendment A contains three separate subjects, we are mindful of the admonition against employing a type of review that substitutes one of the Amendment's incidents for the real object or purpose.  *See Herried*, 10 S.D. 109, 72 N.W. at 97.  Indeed, our focus here is not on whether each provision could have been separately submitted to the voters.  As the Court in *Timme* explained, to require provisions that could stand alone to be submitted separately would "render it practically impossible to amend the constitution[.]"  11 N.W. at 790.  However, amendments that "relate to more than one subject, and

_____

(. . . continued)

    definition of "marihuana" does not include hemp); 7 U.S.C. § 1639*o* (2018) (defining hemp as "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis").  Given these changes by Congress and the definitions in Amendment A, the dissent's suggestion that there was some necessary connection or dependence between broadly legalizing marijuana and regulating hemp in the 2020 election is simply unsustainable.

18.    For example, the regulation of beef production for human consumption and the regulation of manufacturing leather from a cowhide embrace two products with shared biological origins.  Yet, their regulation in those respects involves distinct purposes or objects that are not dependent upon or connected to one another.

have at least two distinct and separate purposes, not dependent upon or connected with each other[,]" *see Herried*, 10 S.D. 109, 72 N.W. at 97, must be submitted so that each can be voted on separately.

[¶56.]     This is in part because the single subject and separate vote requirements exist to prevent the "pernicious practice" of combining unrelated provisions in one amendment to ensure passage of a provision that might otherwise fail had the provisions been submitted separately. *See Herried*, 10 S.D. 109, 72 N.W. at 96. This prohibited practice is commonly referred to as "logrolling." The dissent recognizes "the need to prevent risks associated with logrolling," but then it examines only one danger of logrolling—voter confusion. *See* Dissent ¶ 82.

[¶57.]     The voters may or may not have been fully informed about Amendment A's provisions. However, even if there was no voter confusion, that does not eliminate the need to address another harm created by logrolling— requiring the voters to decide on more than one separate and distinct proposition with a single vote. The Arizona Supreme Court used the following example to illustrate this type of logrolling:

> Three interested parties are desirous respectively of securing the enactment into law of three distinct propositions, A, B, and C. These propositions are so essentially dissimilar that it is obvious that the legislators, who must pass thereon, will probably be divided in their opinion as to their merit. Some of them may earnestly desire proposition A, while being opposed, though in a lesser degree, to B and C. Others consider the enactment of proposition B of paramount importance, while objecting to A and C, while the members of a third group are willing to sacrifice their convictions on A and B for the sake of securing C. The original framers of the three propositions, realizing this situation, place them all in one measure, so that a legislator must vote either yes or no on the measure as a whole. He is thus forced, in order to secure the enactment of the

> proposition which he considers the most important, to vote for
> others of which he disapproves.

*Kerby v. Luhrs*, 36 P.2d 549, 552 (Ariz. 1934). While this example relates to actions

of legislators, the Arizona court aptly observed that if this type of logrolling is

prohibited "in the Legislature, where they deal only with statutes," they are "much

more" objectionable "when constitutional changes, far-reaching in their effect, are to

be submitted to the voters."[19] *Id.*

[¶58.] We do not discount the "strong presumption of constitutionality after

adoption by the people[.]" *Barnhart*, 88 S.D. at 512, 222 N.W.2d at 136. However,

because Amendment A plainly embraces multiple subjects, not dependent upon or

connected with each other, South Dakota voters were "compelled either to reject all

three on account of one" they disapproved "or else to accept two provisions they

disapprove to secure the adoption of one which meets their favor."[20] *See Kerby*, 36

P.2d at 555.

---

19. Although the case cited by the dissent does not actually *explain* logrolling, *see State ex rel. Jensen v. Kelly*, 65 S.D. 345, 274 N.W. 319 (1937), the decision is nevertheless worth reference. The case involved legislative enactments and the provision in Article XII, § 2 that "[n]o law shall embrace more than one subject, which shall be expressed in its title." *Id.* at 321. The Court in *Jensen* observed that compliance with "this section of the Constitution is mandatory." *Id.* at 322 (citation omitted). Ultimately, the *Jensen* Court concluded that there was a direct violation of Article XII, § 2 and voided the appropriation, noting that a decision upholding it would "permit the objectionable practice at which the constitutional provision under consideration is directed." *Id.* at 323. So too here, we conclude that compliance with the single subject and separate vote requirements in Article XXIII, § 1 is no less mandatory for constitutional amendments presented to the voters.

20. Neither the Proponents nor the dissent have identified a prior instance when voters in another state have been asked to approve a constitutional

(continued . . .)

[¶59.]      For instance, a voter wanting to ensure that the Legislature is constitutionally mandated to provide and maintain access to medical marijuana for the limited purpose of his or her own serious health condition or the health condition of a loved one could not do so without casting a vote to legalize and decriminalize marijuana for all persons at least 21 years of age. Similarly, a farmer wanting to ensure that the Legislature is mandated, under the constitution, to create and maintain a statutory framework for the production and sale of hemp in South Dakota, could not do so without voting in favor of broadly legalizing marijuana.

[¶60.]      It is also problematic that it appears from submissions in the record that the drafters of Amendment A folded the additional subjects of hemp and medical marijuana into this single amendment to aggregate votes and increase the chances for passage of the provisions legalizing and regulating recreational marijuana.[21] For example, the version of Amendment A submitted to the South Dakota Legislative Research Council identified that the purpose is "to make marijuana legal under state and local law for adults twenty-one (21) years of age and older, and to control the commercial production and distribution of marijuana under a system that licenses, regulates, and taxes the businesses involved." While

_____

(. . . continued)
   amendment to legalize recreational marijuana, medical marijuana, and hemp
   in a single vote.

21.   Standing alone, South Dakota voters overwhelmingly supported legalizing
      marijuana for medical use in IM 26. However, because recreational
      marijuana was paired in Amendment A with initiatives for hemp and medical
      marijuana, it is impossible to know how recreational marijuana would have
      fared on its own.

the version of Amendment A submitted to the voters does not contain the purpose section, the initial submission of Amendment A by the drafters confirms that the purpose of Amendment A was to create a comprehensive scheme for the legalization and regulation of recreational marijuana, and the first 13 sections lay out this comprehensive plan. Then, seemingly as a tack on, the Amendment contains one section (§ 14) mandating the Legislature to act in regard to medical marijuana and hemp.[22] This type of quintessential logrolling is precisely what Article XXIII, § 1 forbids and the type of "pernicious practice" condemned in *Herried*. Therefore, for all the reasons stated, we conclude that the submission of Amendment A to the voters was plainly and palpably unconstitutional.

### *Whether the doctrine of separability applies*

[¶61.]        Proponents, however, ask that this Court refrain from invalidating Amendment A in its entirety and instead uphold the provisions of Amendment A that relate to the object or purpose of the Amendment and sever those provisions that pertain to unrelated matters. Proponents argue that the first 13 sections of the Amendment legalizing and regulating marijuana for all persons at least 21 years old can be easily separated from the medical marijuana and hemp provisions added

---

22.    The dissent disagrees with the characterization of § 14 as a tack on, but it does not explain how the provisions of § 14 are incidental to or necessarily connected with each other or with the first 13 sections of Amendment A. As the case cited by the dissent explained, distinct propositions need not be submitted separately "when an overall change might be impossible to effectuate if the voters could choose to adopt certain parts of the proposed amendment and not others." *See McConkey v. Van Hollen*, 783 N.W.2d 855, 862 (Wis. 2010). Here, however, § 14 was neither necessary to, nor connected with, effecting the changes in the first 13 sections of Amendment A, legalizing recreational marijuana.

at the end of Amendment A. They direct this Court to cases in which we have applied the doctrine of separability to legislative enactments deemed unconstitutional. *See, e.g., Dakota Sys., Inc. v. Viken*, 2005 S.D. 27, ¶ 20, 694 N.W.2d 23, 32. They also contend that Miller, as the party challenging the Amendment, has the burden of establishing non-separability. *See S.D. Educ. Ass'n v. Barnett*, 1998 S.D. 84, ¶ 33, 582 N.W.2d 386, 394 (providing that "the burden to show that the legislature would not have enacted the statute without the severed portion is on the shoulders of the person arguing against severability" (citation omitted)).

[¶62.]        Although this Court has applied separability in the context of the single subject requirement for legislative actions in Article III, § 21, the language of Article XXIII, § 1 contains an additional requirement that "[i]f more than one amendment is submitted *at the same election*, each amendment *shall be so prepared and distinguished* that it can be voted upon separately." (Emphasis added.) By requiring proponents to present different subjects separately, so each proposal can be considered and voted on separately, Article XXIII, § 1 imparts an important level of protection to the voters. As this Court recognized, the voters face a dilemma with a "take it or leave it" amendment containing multiple different subjects because the voters, unlike legislators, have no opportunity for debate and negotiation when multiple subjects are embraced in one amendment. To create a remedy that would allow separability after an amendment, submitted in clear violation of Article XXIII, § 1, is voted on would provide no incentive for future proponents of an amendment to comply with this Constitutional mandate. More importantly, the

voters will be without the protections Article XXIII, § 1 provides. As two commentators have explained, invalidating the amendment in its entirety "provides the strongest deterrent to combining separable proposals." Robert D. Cooter & Michael D. Gilbert, *A Theory of Direct Democracy and the Single Subject Rule*, 110 Colum. L. Rev. 687, 722 (2010).

[¶63.] Similarly, other courts have voided the entire amendment when there is a violation of the single subject or separate vote requirements based on the view that the constitutional violation taints the entirety of the initiated amendment. As the Montana Supreme Court explained, "a constitutional amendment submitted to the electorate in violation of the separate-vote requirement is void in its entirety" because "[v]oters had no way to express their opinions" on each proposed constitutional amendment. *Mont. Ass'n of Cntys. v. State*, 404 P.3d 733, 747 (Mont. 2017). The Oregon Supreme Court similarly concluded that a failure to comply with the constitutional mandates for a constitutional amendment voids it in its entirety. *Armatta*, 959 P.2d at 68. We find the reasoning of these courts persuasive. Importantly, Proponents fail to cite any case that has not voided the entire amendment when submission of the amendment failed to comply with the single subject or separate vote requirements.

[¶64.] Because the submission of Amendment A to the voters was not prepared and distinguished such that the different subjects could be considered and voted on separately, "judicial surgery" cannot "cure" the violation of Article XXIII, § 1. *See Cal. Trial Lawys. Ass'n v. Eu*, 245 Cal. Rptr. 916, 922 (Cal. Ct. App. 1988), *overruled in part on other grounds in Lewis v. Superior Ct.*, 970 P.2d 872 (Cal.

1999).  This singular view is consistent with the plain text of Article XXIII, § 1, which not only includes a single subject requirement but also directs proponents of a constitutional amendment to prepare an amendment so that the different subjects can be voted on separately.  This constitutional directive could not be expressed more clearly—each subject must be voted on separately—and simply severing certain provisions may or may not reflect the actual will of the voters.  Therefore, we cannot accept Proponents' suggestion that excising the medical marijuana and hemp provisions from Amendment A in favor of retaining the provisions regulating and legalizing recreational marijuana is an appropriate remedy.  Amendment A is void in its entirety.

## Conclusion

[¶65.]    The circuit court properly dismissed Thom and Miller's election contest because they identified no irregularity in the election process.  The circuit court also correctly concluded that a challenge to Amendment A was not required to be brought before the election.  However, the circuit court erred in determining that Thom and Miller had standing to challenge Amendment A in their official capacities.  Nevertheless, the Governor's ratification of Miller's declaratory judgment action cured the standing defect, and the action could proceed as if it had been commenced by the real party in interest.  Finally, we conclude that the submission of Amendment A to the voters plainly and palpably violated Article

XXIII, § 1, and therefore, we need not address the circuit court's additional ruling that Amendment A is a revision requiring a constitutional convention.[23]

[¶66.]     Affirmed.

[¶67.]     KERN and DEVANEY, Justices, concur.

[¶68.]     SALTER, Justice, concurs specially.

[¶69.]     MYREN, Justice, concurs in part and dissents in part.


SALTER, Justice (concurring specially).

[¶70.]     I agree with the Court's conclusion that Amendment A violated the single-subject rule. I write separately to emphasize the substantive nature of the right Article XXIII, § 1 confers upon South Dakota voters and also to respectfully add my views concerning the effect of a single-subject violation.

[¶71.]     Direct democracy provisions, such as the one in Article XXIII, § 1 "encumber[] political bargaining" because the multitude of "scattered citizens cannot effectively bargain with each other over public policies." Cooter & Gilbert, *supra* ¶ 62, at 689. A single-subject rule, however, "attempts to mitigate this problem" by eliminating the results of political bargaining—combining multiple measures to achieve majority support, or "logrolling," and joining relatively unpopular measures with more popular ones, also known as "riding." *Id.* at 689–90.

---

23.   It was also unnecessary for the dissent to analyze the question whether Amendment A is a revision requiring a constitutional convention. Because the majority of this Court concluded that Amendment A violates Article XXIII, § 1, the dissent's examination of the Amendment under Article XXIII, § 2 is dicta.

[¶72.]        The contemporary version of Article XXIII, § 1 includes both an explicit single-subject rule and a one amendment/one vote requirement.  By approving these amendments in 2018, South Dakota voters instituted an emphatic single-subject command, establishing for themselves the right to cast a ballot secure in the belief that their vote could only ever affect one aspect of public policy.  The workable test described by the Court today demonstrates a justifiable commitment to the "single" part of the single-subject rule.  Properly applied, the test should produce correct and consistent results that eliminate intractable situations in which voters must compromise their participation in direct democracy to cast an all-or-nothing ballot.

[¶73.]        But, of course, those concerns cannot be allayed here because this case arises after an election, and we must consider the effect of the Proponents' non-compliance.  I am not as convinced as the other members of the Court's majority that a violation of Article XXIII, § 1 renders the entire amendment void in all instances.

[¶74.]        In several of our previous decisions, we have held that the Legislature's violation of a nearly identical constitutional single-subject rule for statutes contained in Article III, § 21 was not fatal.  Applying the doctrine of separability, we have excised the unconstitutional provisions and upheld the remainder of the statute "if it appears that the legislature would have intended the remainder to take effect without the invalidated section."  *Simpson v. Tobin*, 367 N.W.2d 757, 768 (S.D. 1985) (citation omitted); *see also Application of Nelson*, 83 S.D. 611, 619, 163 N.W.2d 533, 537 (1968) ("The doctrine of separability requires the court to uphold any phase of the measure if the legislature would have enacted

that much without the part the constitution rejects." (citing *State ex rel. Mills v. Wilder*, 73 S.D. 330, 42 N.W.2d 891 (1950))); *South Dakota Ass'n of Tobacco and Candy Distribs. v. Dep't of Revenue*, 280 N.W.2d 662, 666 (S.D. 1979) (holding a violation of the single-subject rule did not render an entire statute void); *South Dakota Educ. Ass'n/NEA v. Barnett*, 1998 S.D. 84, ¶¶ 30–38, 582 N.W.2d 386, 394–95 (same).

[¶75.]     Here, the Proponents seek a form of separability, but not the one prescribed by our cases.  Instead, the Proponents source their argument to § 15 of Amendment A, which purports to be a severance provision stating that the unconstitutionality of any section of Amendment A "shall not affect other provisions or applications of the article that can be given effect without the invalid or unconstitutional provision or application[.]"  But this provision cannot serve as the basis for our separability analysis because it overlooks the requirement to show that the violation was inconsequential to the outcome of the election.

[¶76.]     On this latter point, the Proponents have not argued that a violation of the single-subject rule was harmless or that Amendment A would have passed even without its extraneous inclusion of medical marijuana and hemp.  I would, therefore, leave for another day the question of whether a violation of Article XXIII, § 1's single-subject rule renders a constitutional amendment void in all cases.  I otherwise join the Court's opinion.

MYREN, Justice (concurring in part and dissenting in part).

[¶77.]      The initiative and referendum provisions of South Dakota Constitution Article III, § 1 "give the right of direct democracy to the public." Patrick M. Garry, The South Dakota State Constitution 56 (G. Alan Tarr, Series Editor, Oxford Univ. Press, 2014). This bold experiment in citizen-led direct democracy began before statehood. *Brendtro v. Nelson*, 2006 S.D. 71, ¶ 24, 720 N.W.2d 670, 678.

> The movement for the initiative and referendum began in 1885 and continued for the next thirteen years as the Farmer's Alliance, the Knights of Labor, the Initiative and Referendum League, and the Populist Party kept the issue before the people through a non-partisan educational campaign that turned into a political movement. The movement was spurred by economic unrest, the complacency of political leaders, as well as a spirit of political independence. Direct democracy was seen as a way to "cleanse the legislative process." The movement gained the platform to successfully launch this proposal when in 1896 the Populists gained control of both houses of the legislature and the governorship.

*Id.* (citations omitted).

[¶78.]      In 1897, a majority of the Populists in both houses of the Legislature "proposed amending article III, § 1 of the constitution to provide for the initiative and referendum." *Id.* ¶ 25, 720 N.W.2d at 678.

> In the ensuing campaign, Populist Governor Andrew O. Lee, a chief proponent of the proposal, argued that the passage of the initiative and referendum would "end the powers of special interests, save taxpayers money, and enable citizens to secure various pieces of needed legislation."
>
> The electorate approved the amendment on November 8, 1898.

*Id.* ¶¶ 25–26, 729 N.W.2d at 678 (citations omitted).

> The first statewide use of the initiative and referendum was at the November 1908 general election. 1909 South Dakota Legislative Manual at 373. The people initiated an act to

> provide for the licensing, restricting and regulation of the business of the manufacture and sale of spirituous and intoxicating liquors. 1907 S.D. Sess. L. ch. 179.

*Id.* ¶ 27, 720 N.W.2d at 679.

[¶79.]　　　In 1972, the people overwhelmingly passed an amendment to South Dakota Constitution Article XXIII, § 1 which provided, in part, "Amendments to this Constitution may be proposed by initiative or by a majority vote of all members of each house of the legislature." S.D. Const. art. XXIII, § 1, Historical Notes. The vote was 173,541 for and 84,939 against. *Id.* At the November 3, 2020 general election, South Dakota voters approved Initiated Constitutional Amendment A entitled, "An amendment to the South Dakota Constitution to legalize, regulate and tax marijuana; and to require the Legislature to pass laws regarding hemp as well as laws ensuring access to marijuana for medical use."[24] It was approved by a comfortable margin, receiving 225,260 "Yes" votes (54.2%) and 190,477 "No" votes (45.8%).

[¶80.]　　　When examining a constitutional amendment, this Court heeds two basic principles articulated in *Barnhart*, 88 S.D. at 512, 222 N.W.2d at 136. First, "[w]hen considering a constitutional amendment after its [a]doption by the people, the question is not whether it is possible to [c]ondemn the amendment, *but whether it is possible to [u]ph[o]ld it.*" *Id.* (emphasis added). Second, an amendment "should be sustained unless it '*plainly and palpably appear(s) to be invalid.*'" *Id.* (emphasis added) (quoting *Herried*, 10 S.D. at 121, 72 N.W. at 97). In applying these basic

---

24. The full text of Initiated Constitutional Amendment A is found at Appendix A of this concurrence in part and dissent in part.

principles, I believe that the propositions in Constitutional Amendment A are "incidental to and necessarily connected with" the object of providing a comprehensive plan for all phases of legalization, regulation, use, production, and sale of marijuana and related substances. *Herried*, 10 S.D. at 121, 72 N.W. at 97; *Barnhart*, 88 S.D. at 511, 222 N.W.2d at 135. They are "necessary to accomplish [its] single purpose." *Herried*, 10 S.D. at 120, 72 N.W. at 97 (quoting *Timme*, 11 N.W. at 791). Therefore, I dissent from the majority's decision that Amendment A violates South Dakota Constitution Article XXIII, § 1 and is void in its entirety.[25]

[¶81.]        *Herried* and *Barnhart* provide the analysis for determining whether Amendment A contains more than one subject in violation of Article XXIII, § 1.[26]

---

25.   I have no general disagreement with the majority's treatment of the issues concerning the propriety of the election contest, standing, the timing of the challenge to Constitutional Amendment A, and severance or separability. Therefore, I concur in those parts of the majority opinion.

26.   The parties cite cases from around the country setting forth tests for determining whether there is more than one subject in a constitutional amendment or in legislation. These authorities apply varying standards based upon the applicable constitutional language, history, and precedents in each of those states. South Dakota has its own carefully considered decisional law which sets forth the appropriate presumptions and analysis based on South Dakota's constitutional history. Therefore, our review should remain moored to those presumptions and that analysis. For that reason, I depart from the majority's reliance on cases such as *Kerby*, 36 P.2d 549 and *Armatta*, 959 P.2d 49 which are regarded as requiring a "strict construction of . . . separate vote provisions" unduly restrictive of "the people's right to package provisions in a single . . . initiative." *See Californians for an Open Primary v. McPherson*, 134 P.3d 299, 317–27 (Cal. 2006) (analyzing but rejecting a "test different from and stricter than the traditional test" for single subject violations (emphasis omitted)). Such an approach is contrary to the long history of the initiative in South Dakota.

*Herried* began by observing the need to prevent risks associated with logrolling.[27] In both *Herried* and *Barnhart*, this Court identified the subject and "object or purpose" of an amendment by looking to its contents and not just its title or the Attorney General's explanation. *See Herried*, 10 S.D. at 121, 72 N.W. at 97; *Barnhart*, 88 S.D. at 511, 222 N.W.2d at 135. After identifying the object or purpose, this Court considered the propositions in the amendment to determine whether they were "incidental to and necessarily connected with the object intended." *Herried*, 10 S.D. at 121, 72 N.W. at 97; *Barnhart*, 88 S.D. at 511, 222 N.W.2d at 135. In doing so, this Court paid deference to "[t]he strong presumption of constitutionality after adoption by the people" and that an amendment "should be sustained unless it 'plainly and palpably appear(s) to be invalid.'" *Barnhart*, 88 S.D. at 512, 222 N.W.2d at 136 (quoting *Herried*, 10 S.D. at 121, 72 N.W. at 97). Applying those standards, only one amendment was found to exist in both cases. *Herried*, 10 S.D. at 121, 72 N.W. at 97; *Barnhart*, 88 S.D. at 512, 222 N.W.2d at 136.

[¶82.] Applying the same analysis here requires due regard for the need to protect voters from the dangers of logrolling. This Court has assessed claims of logrolling by analyzing whether there was a combining of "meritorious" and "vicious legislation" and by evaluating whether the amendment, as proposed, presented a

---

27. Logrolling has been more fully explained with regard to the need for anti-logrolling provisions. In the legislative context, "[t]he history and purpose of such [a] provision is well understood; as stated by this court, it is intended to prevent the bringing together in one act of subjects having no necessary connection or relation with each other, to guard the Legislature and persons affected by the Law against surprise and imposition, and to prevent popularly called logrolling legislation." *Jensen*, 65 S.D. at 349–50, 274 N.W. at 322.

risk of "surprise and imposition" to the persons affected by the Law. *Herried*, 10 S.D. at 119, 72 N.W. at 96; *Jensen*, 65 S.D. at 349–50, 274 N.W. at 322. From the outset, the petition circulated to initiate Amendment A was entitled by the Attorney General: "An amendment to the South Dakota Constitution to legalize, regulate, and tax marijuana; and to require the Legislature to pass laws regarding hemp as well as laws ensuring access to marijuana for medical use."[28] The title informed voters of the Amendment's inclusion of the propositions mentioned, and the complete Amendment accompanied the petition. The Attorney General's explanation, which also accompanied the petition, elaborated on the propositions in the Amendment.[29]

[¶83.]     The entire petition process was designed to educate voters. *See* Recommendations of the Constitutional Revision Commission, Vol. 1, (Dec. 15, 1971) [hereinafter *Commission Recommendations*] 69 (noting the petition process is partly intended to help ensure "an adequate opportunity [for the people] to inform themselves about the proposed amendment"). The Attorney General's explanation contributed to that education effort. SDCL 12-13-25.1 (requiring the Attorney General's explanation to "educate the voters of the purpose and effect of the proposed . . . initiated amendment to the Constitution"). As required by law, the Secretary of State distributed public information about the Amendment, including

---

28.     SDCL 12-13-25.1 requires the Attorney General to prepare a statement consisting of a title and explanation to be circulated as part of the initiative petition. SDCL 2-1-1.1(3).

29.     The full text of the Attorney General's statement is found at Appendix B of this concurrence in part and dissent in part.

statements in support and opposition by the respective proponents and opponents, along with the Attorney General's title, explanation, and recitation of the effect of a yes or no vote. SDCL 12-13-23; Steve Barnett, *South Dakota 2020 Ballot Questions*, https://sdsos.gov/elections-voting/election-resources/election-history/2020_Election_History.aspx.

[¶84.]       This Court is to presume the existence of an informed electorate. *Barnhart*, 88 S.D. at 515, 222 N.W.2d at 137. Moreover, notice can be taken of "the circumstances and publicity surrounding the circulation and signing of the petition . . . ." *Baker,* 2001 S.D. 49, ¶ 27, 625 N.W.2d at 274.[30] Few, if any, ballot measures have garnered the media attention and public discussion generated by Amendment A. This extensive public scrutiny "dilute[d] the risk of voter confusion [and] deception" associated with logrolling. *Id.* (quoting *Amador Val. Joint Union H. Sch. Dist. v. State Bd. Of Equalization*, 583 P.2d 1281, 1291 (Cal. 1978)). *See also Barnhart*, 88 S.D. at 515, 222 N.W.2d at 137 (noting the "widespread publicity in all of the news media, and [the] . . . intense public and private discussion preceding [the] submission of the amendment").

[¶85.]       Additionally, anti-logrolling measures such as a separate vote requirement are not intended to "prohibit a single constitutional amendment from being complex or multi-faceted, or from containing a variety of specific prescriptions and proscriptions." *McConkey v. Van Hollen*, 783 N.W.2d 855, 862 (Wis. 2010).

---

30.    Although *Baker* itself did not involve a more than one subject challenge to an initiated constitutional amendment, *Amador Val. Joint Union H. Sch. Dist. v. State Bd. of Equalization*, 583 P.2d 1281 (Cal. 1978), on which *Baker* relied, did.

Miller asserts that there were 22 to 32 separate subjects in Amendment A. Taken to its logical conclusion, Miller's theory would have required the same number of separate votes in the 2020 election to accomplish the objectives of Amendment A. Commenting on *Timme*, 11 N.W. 785, the *McConkey* court observed: "We rejected as absurd the contention that each distinct proposition must be submitted separately. Such an approach would make amending the constitution unduly difficult, especially for complex issues or when an overall change might be impossible to effectuate if the voters could choose to adopt certain parts of the proposed amendment and not others." 783 N.W.2d at 862. This concern is particularly well-taken in this case.

[¶86.] After consideration of the risks of logrolling, the next step in the more than one subject analysis is to identify the subject and "object or purpose" of Amendment A by looking to its contents as well as its title and the Attorney General's explanation. *See Herried*, 10 S.D. at 121, 72 N.W. at 97; *Barnhart*, 88 S.D. at 510, 222 N.W.2d at 135. Vital to this step is the need to avoid "substituting for the real object or purpose" of the amendment "one of its incidents." *Herried*, 10 S.D. at 121, 72 N.W. at 97.

[¶87.] Amendment A contains propositions legalizing recreational marijuana, mandating the Legislature's passage of laws ensuring access to medical marijuana, and regulating the cultivation, processing, and sale of hemp. The Amendment's title provides: "An amendment to the South Dakota Constitution to legalize, regulate, and tax marijuana; and to require the Legislature to pass laws regarding hemp as well as laws ensuring access to marijuana for medical use." The Attorney

General's explanation provides in relevant part that the Amendment: "legalizes the possession, use, transport, and distribution of marijuana" by certain individuals; "requires the Legislature to pass laws regarding medical use of marijuana;" and "requires the Legislature to pass laws regulating the cultivation, processing, and sale of hemp."

[¶88.] Reviewing the contents of Amendment A along with its title and the Attorney General's explanation, it is plain that the Amendment was intended to provide a comprehensive plan for all phases of legalization, regulation, use, production, and sale of marijuana and related substances. *See Herried*, 10 S.D. at 121, 72 N.W. at 97 (looking beyond the joint resolution proposing the amendment to identify its subject); *Barnhart*, 88 S.D. at 510, 222 N.W.2d at 135 (looking beyond the joint resolution and Attorney General's explanatory statement in identifying the purpose of the amendment).

[¶89.] Comprehensive plans are not prohibited in a single constitutional amendment if they are related to a single purpose. *Herried*, 10 S.D. at 120, 72 N.W. at 97 (it is not required "to submit, as separate amendments, the separate propositions necessary to accomplish a single purpose" (quoting *Timme*, 11 N.W. at 791)); *Barnhart*, 88 S.D. at 511, 222 N.W.2d at 136 (propositions may be submitted in a single proposal if "related to a single purpose, plan, or subject" (quoting *Fugina v. Donovan*, 104 N.W.2d 911, 914 (Minn. 1960))). Propositions that "may be logically viewed as parts or aspects of a single plan" may be submitted as one amendment. *Barnhart*, 88 S.D. at 512, 222 N.W.2d at 136 (quoting *Keenan v. Price*, 195 P.2d 662, 678 (Idaho 1948)). *See also McConkey*, 783 N.W.2d at 862 (rejecting

requirements making amendment of the constitution "unduly difficult" for complex issues or overall changes).[31]

[¶90.] The final step in the more than one subject analysis is to determine whether the propositions in Amendment A are "incidental to and necessarily connected with" its object or purpose. *Herried*, 10 S.D. at 121, 72 N.W. at 97; *Barnhart*, 88 S.D. at 511, 222 N.W.2d at 135. In this review, this Court is to apply "[t]he strong presumption of constitutionality after adoption by the people" and that an amendment "should be sustained unless it 'plainly and palpably appear(s) to be invalid.'" *Barnhart*, 88 S.D. at 512, 222 N.W.2d at 136 (quoting *Herried*, 10 S.D. at 121, 72 N.W. at 97).

[¶91.] Amendment A sets forth:

- relevant definitions;

- a statement of marijuana-related criminal, negligence and malpractice laws left unaffected by legalization;

- provisions for labor relations, property rights, and local control in light of legalization;

- provisions to decriminalize marijuana offenses;

- civil penalties for non-criminal cultivation, smoking, distribution, and paraphernalia violations;

---

31. Proponents sought to address recent controversies over legalization of marijuana, medical marijuana, and hemp broadly in a single amendment. *See Barnhart*, 88 S.D. at 509, 222 N.W.2d at 134 (noting the "widespread publicity" preceding submission of the amendment). Proponents intended to embed the rights afforded by Amendment A in the Constitution to escape the fate of earlier initiated comprehensive legislation repealed by the Legislature, using the initiative where the Legislature failed to act. *Brendtro*, 2006 S.D. 71, ¶ 29, 720 N.W.2d at 680 (noting a purpose of the initiative is to empower the people to enact measures "in the event the legislature fails to act . . . ." (quoting *Byre v. City of Chamberlain*, 362 N.W.2d 69, 79 (S.D. 1985))).

- exclusive licensure and regulatory power for the Department of Revenue (the Department) over all aspects of marijuana sales in the state, power to administer and enforce the amendment, and licensure authority over marijuana producers and sellers;

- a time limit for the Department's promulgation of rules and regulations implementing and enforcing the amendment and creation of a mandamus remedy for inaction;

- numerical guidelines for marijuana-related licenses;

- criminal and civil immunity for permitted acts of marijuana licensees;

- immunity from professional disciplinary proceedings for providing services related to marijuana licensees or applications relating to marijuana;

- reservation of local control over licensees and limited cultivation of marijuana;

- imposition of a tax on marijuana sales, a schedule for acceptable increases, and appropriation of tax revenue;

- directives for the Department's rule-making pursuant to the amendment and for appeals of aggrieved persons to proceed under the Administrative Procedures Act (SDCL ch. 1-26);

- a requirement for an annually published report by the Department about information relevant to the amendment;

- a time limit for the Legislature's passage of laws on medical marijuana and hemp; and

- a provision for severance of any invalid or unconstitutional provisions.

[¶92.] All of these propositions relate to marijuana or hemp and are "incidental to and necessarily connected with the object" or purpose of providing a comprehensive plan for all phases of legalization, regulation, use, production, and sale of marijuana and related substances. *See Herried*, 10 S.D. at 121, 72 N.W. at 97; *Barnhart*, 88 S.D. at 511, 222 N.W.2d at 135. That any one of these propositions

might have been submitted separately is not controlling because they are all "necessary to accomplish [the amendment's] single purpose." *Herried*, 10 S.D. at 120, 72 N.W. at 97 (quoting *Timme*, 11 N.W. at 791). Therefore, I would conclude that Amendment A contains a single subject and does not violate Article XXIII, § 1 of the South Dakota Constitution.

[¶93.] The majority notes that a review of the Amendment's propositions and their connectedness to one another that is divorced from a consideration of the object and purpose of the Amendment runs "the risk of defining the object or purpose . . . too narrowly or too broadly." I agree. The majority then notes that focusing on the different propositions of an amendment in isolation risks improperly substituting "for the real object or purpose [of the amendment] one of its incidents." *Herried*, 10 S.D. at 121, 72 N.W. at 97 (quoting *Timme*, 11 N.W. at 791). Again, I agree. However, after noting these two salient points, the majority then proceeds to narrow its focus on the first 13 sections of Amendment A to identify its object or purpose. Having narrowed the purpose, the majority then concludes that the propositions in § 14 concerning medical marijuana and hemp constitute separate subjects in violation of Article XXIII, § 1. Instead of reviewing all of the propositions in Amendment A for their connectedness to one another, the majority examines the propositions on recreational marijuana in isolation. In the process, the majority is substituting the real object or purpose of the Amendment for one of its incidents as warned against in *Herried*. I disagree with this analysis.

[¶94.] The majority offers a series of rationales for its approach. It sifts through the propositions in Amendment A on recreational marijuana, medical

marijuana, and hemp, identifies only their separate objects or purposes, and concludes that the Amendment contains three separate subjects. In short, it looks for what separates the propositions in the Amendment instead of what connects them—the comprehensive plan for all phases of legalization, regulation, use, production, and sale of marijuana and related substances. A similar approach in *Barnhart* would have likewise concluded that the amendment in that case contained separate subjects. The amendment made more than 20 changes in the executive branch of state government, ranging from gubernatorial terms of office to the governor's power to correct errors in legislative bills. *Barnhart*, 88 S.D. at 510, 222 N.W.2d at 135. Beyond the fact that all of the propositions in the amendment involved the executive branch of state government, many of them had no other connected object or purpose. Yet, this Court upheld them all as related to the amendment's general purpose "to engender greater efficiency and responsibility in the executive branch of state government by gathering a multitude of independent boards and commissions under the control of the governor, and to eliminate unnecessary offices and burdensome restrictions on remaining offices." *Id.* Amendment A's comprehensive plan is entitled to equal deference.

[¶95.] The majority rejects any connected object or purpose between recreational marijuana, medical marijuana, and hemp based upon "their shared biological origin from the cannabis plant and a common plan to comprehensively regulate all products produced by" that plant. It dismisses any such connection as insufficient for purposes of *Herried* and *Barnhart*. But this dismissal ignores the history of dual regulation of marijuana and hemp dating back at least as far as the

Marihuana[32] Tax Act of 1937. *New Hampshire Hemp Council, Inc. v. Marshall*, 203 F.3d 1, 7 (1st Cir. 2000). Some of this history is explained in *Hemp Council* which, at the outset, notes the shared biological origin of marijuana and hemp: "both the drug commonly known as marijuana and various industrial products . . . derive from different portions of the plant popularly called the hemp plant and designated *Cannabis sativa* in the Linnaean system of botanical classification." 203 F.3d at 3. The dual regulation of marijuana and hemp despite hemp's non-psychoactive properties was "easily justif[ied]" by the "problems of detection and enforcement" related to marijuana. *Id.* at 6. *Accord United States v. White Plume*, 447 F.3d 1067, 1073 (8th Cir. 2006) (noting "though at 'some stage' Cannabis sativa may contain such low levels of THC that it would be impractical to use as a drug, 'problems of detection and enforcement easily justify a ban broader than the psychoactive variety of the plant'" (quoting *Hemp Council*, 203 F.3d at 6)).

[¶96.] Based upon this history of dual regulation, it is logical that Proponents seeking legalization and regulation of marijuana also sought to make some provision for legalization and regulation of hemp at a time when hemp was not yet legal in South Dakota. In my view, this connected object or purpose is sufficient for purposes of *Herried* and *Barnhart*.

[¶97.] The majority concludes Amendment A represents precisely the type of logrolling Article XXIII, § 1 forbids. Yet, the majority makes no assertion that voters were misinformed about or confused by the Amendment. Despite that, the

---

32.    "Federal statutes use the spelling 'marihuana,' . . . ." *New Hampshire Hemp Council, Inc. v. Marshall*, 203 F.3d 1, 3 n.1 (1st Cir. 2000).

majority perceives the Amendment as forcing a choice on voters, compelling them to reject all three of its propositions because of one they disapprove of, or to accept two propositions they disapprove of to secure one they favor—medical marijuana. However, voters who favored only medical marijuana had that choice available in the 2020 election in IM 26, which also passed. The majority attempts to distill some meaning from the higher passage rate for IM 26, asserting it shows medical marijuana on its own is more popular than when combined with other propositions. But the significant point is that *both* amendments passed, one handily and one comfortably. *Both*, therefore, not just one, are entitled to the "strong presumption of constitutionality after adoption by the people . . . ." *Barnhart*, 88 S.D. at 512, 222 N.W.2d at 136. In my view, the majority is mistaken in attempting to ascribe more meaning to the election results than that.

[¶98.] Citing Proponents' original statement of purpose for Amendment A as submitted for review by the Legislative Research Council, the majority concludes § 14 on medical marijuana and hemp was seemingly a tack on, resulting in logrolling. But the Proponents' statement of purpose referred to commercial production, businesses involved, cultivation, and products containing marijuana. More significantly, the Amendment *as submitted* defined both hemp and marijuana at the outset, distinguished between them, and included § 14 on medical marijuana and hemp. The section was not simply tacked on. The majority speculates about Proponents' motivations without evidentiary support or a record thereon. This again departs from the "strong presumption of constitutionality" we are to accord to Amendment A. *Barnhart*, 88 S.D. at 512, 222 N.W.2d at 136.

[¶99.]     Heeding "the strong presumption of constitutionality after adoption by the people" and that an amendment "should be sustained unless it 'plainly and palpably appear(s) to be invalid,'"[33] I would hold that the propositions in Initiated Constitutional Amendment A are all "incidental to and necessarily connected with the object intended" of providing a comprehensive plan for all phases of legalization, regulation, use, production, and sale of marijuana and its related products. *Barnhart*, 88 S.D. at 511, 222 N.W.2d at 135; *Herried*, 10 S.D. at 121, 72 N.W. at 97. They are all "necessary to accomplish [its] single purpose." *Herried*, 10 S.D. at 120, 72 N.W. at 97 (it is not required "to submit, as separate amendments, the separate propositions necessary to accomplish a single purpose" (quoting *Timme*, 11 N.W. at 791)); *Barnhart*, 88 S.D. at 511, 222 N.W.2d at 136 (propositions may be submitted in a single proposal if "related to a single purpose, plan, or subject" (quoting *Fugina*, 104 N.W.2d at 914)). As such, they do not constitute "more than one subject" or multiple subjects in violation of Article XXIII, § 1 of the constitution. *Herried*, 10 S.D. at 120, 72 N.W. at 97 (quoting *Timme*, 11 N.W. at 791).

[¶100.]     Such a holding by the Court would also require reviewing the circuit court's determination that Amendment A is unconstitutional because it is a constitutional revision that should have been submitted to the voters through a constitutional convention rather than by an initiative. The appropriate beginning for considering this question is Article XXIII, § 2 on constitutional conventions and revision, which originally provided:

---

33.     *Barnhart*, 88 S.D. at 512, 222 N.W.2d at 136 (quoting *Herried*, 10 S.D. at 121, 72 N.W. at 97).

> Whenever two-thirds of the members elected to each branch of the legislature shall think it necessary to call a *convention to revise* this constitution they shall recommend to the electors to vote at the next election for members of the legislature, for or against a convention; and if a majority of all the electors voting at said election shall have voted for a convention, the legislature shall, at their next session, provide by law for calling the same. The convention shall consist of as many members as the house of representatives of the legislature, and shall be chosen in the same manner, and shall meet within three months after their election for the purpose aforesaid.

S.D. Const. art. XXIII, § 2 (1889) (emphasis added).[34]

[¶101.] During the first year of the Constitutional Revision Commission's (the Commission) work in 1970, one of its members prepared a report on the history of

---

34. The existence of this "revision by convention" provision from 1889 until its amendment in 1972 controverts Miller's contention that "the procedure for revising the Constitution under Article XXIII, § 2 did not exist until 1972 . . . ." Rather, as Proponents assert, the provision *did* exist when South Dakota adopted and repealed the entire Prohibition article by amendment rather than by revision after convention. *See* S.D. Const. art. XXIV, Historical Notes. This refutes Miller's assertion that an amendment can only change existing articles and cannot create an entirely new article as Amendment A does. The plain language of Article XXIII, § 1 also refutes Miller's claim. It provides that, "[a]mendments to this *Constitution* may be proposed . . . ," *see id.* (emphasis added) not, "[a]mendments to [*articles in*] this Constitution" as Miller would have it read, *see Brendtro*, 2006 S.D. 71, ¶ 34, 720 N.W.2d at 680–81 (emphasis added) (noting "this Court is obligated to apply [the] 'plain meaning'" of the constitution (quoting *In re Janklow*, 530 N.W.2d 367, 370 (S.D. 1995))). Miller relies on other language in Article XXIII, § 1 referring to the amendment of "articles," but he refers to language the Constitutional Revision Commission first proposed in 1970 to make it clear that a single amendment could encompass more than one article. *See* Official Minutes of the Constitutional Revision Commission, 2d Mtg., p. 2 (January 16, 1970). Nothing in the Commission minutes indicates that this language was meant to limit amendments to existing articles.

amendments and revisions of the constitution after statehood. W.O. Farber,[35] Article XXIII: Amendments and Revisions of the Constitution (July 24, 1970). The report summarized the efforts of seven governors from Robert S. Vessey in 1911 to Frank Farrar in 1969 to initiate constitutional conventions or revision commissions. *Id.* at 7–10. Each of them made speeches and used similar terms urging the need for: "complete revision," "general revision," "far reaching changes," "overall revision," "adapt[ation] . . . to modern conditions," "revision and streamlining," "complete review and possible revision," or "realistic revision of our out-dated state constitution." *Id.*

[¶102.] All of the governors' efforts to initiate conventions or commissions were unsuccessful until 1969. *Id.* at 11. The people also rejected legislative proposals to call a convention in both 1914 and 1924. *Commission Recommendations* at 6. Thus, this Court noted in *Barnhart* that "[f]or many years constitutional revision has been a recognized necessity for the State of South Dakota." 88 S.D. at 504, 222 N.W.2d at 132. The "1969 Legislative Session created [the Commission], whose stated purpose [was] to 'enter into a comprehensive study of the Constitution of the State of South Dakota to determine ways and means to improve and simplify the Constitution.'" *Commission Recommendations* at 7.

[¶103.] Following a series of meetings and public hearings, and based upon its "in-depth" research into all of the articles of the constitution, the Commission determined that "many of [its] articles needed substantial revision and

---

35. At that time, Dr. Farber was Chairman of the Department of Government at the University of South Dakota. *Barnhart*, 88 S.D. at 505, 222 N.W.2d at 132.

reorganization." *Id.* at 9. It submitted its recommendations, including proposed amendments and comments, to the Legislature. *Id.* The proposals included amendments to Article XXIII to permit the voters to initiate "[t]he calling of a constitutional convention" and to "specify how amendments and revisions proposed by a constitutional convention [should be] submitted to the voters." *Id.* at 70–71; 1972 S.D. Sess. Laws ch. 4, §§ 2–3. The voters approved the amendments to Article XXIII in 1972, and sections two and three were amended to read:

> § 2.
>
> A convention to *revise* this Constitution may be called by a three-fourths vote of all the members of each house. The calling of a constitutional convention may be initiated and submitted to the voters in the same manner as an amendment. If a majority of the voters voting thereon approve the calling of a convention, the Legislature shall provide for the holding thereof. Members of a convention shall be elected on a nonpolitical ballot in the same districts and in the same number as the house of representatives. Proposed amendments or *revisions* approved by a majority of all the members of the convention shall be submitted to the electorate at a special election in a manner to be determined by the convention.
>
> § 3.
>
> Any constitutional amendment or *revision* must be submitted to the voters and shall become a part of the Constitution only when approved by a majority of the votes cast thereon. The Legislature may provide for the withdrawal by its sponsors of an initiated amendment at any time prior to its submission to the voters.

S.D. Const. art. XXIII, §§ 2–3 (emphasis added).

[¶104.] For all of its efforts, the Commission failed to offer a specific definition of "revision" in Article XXIII, §§ 2–3. Yet, the Commission's history makes clear that it viewed "revision" as something far-reaching, complete, comprehensive, and

substantial. *See Davis v. State*, 2011 S.D. 51, ¶ 77, 804 N.W.2d 618, 644

(Gilbertson, C.J., concurring in result) ("the intent of the drafting bodies and the

historical context of [a] provision" are appropriate secondary sources for

constitutional construction). Whether Amendment A is a revision must be

considered with this history in mind.

[¶105.]        In *Bess v. Ulmer*, 985 P.2d 979, 982 (Alaska 1999), the Alaska Supreme

Court noted that its founders similarly did not define "revision." Therefore, it was

difficult to determine whether a ballot proposition was an amendment or revision.

To define revision, the court found it "helpful to look to the law of California, a state

which has considered the issue carefully over a period of nearly one hundred years."

*Id.* at 984. Among the California authorities cited was *Amador*, 583 P.2d 1281, a

case this Court relied upon in *Baker*, 2001 S.D. 49, ¶ 24, 625 N.W.2d at 273. *See*

*Bess*, 985 P.2d at 985.

[¶106.]        In *Amador*, the California Supreme Court considered whether

Proposition 13, an initiated constitutional amendment adopted by the voters to limit

taxes, was a revision that could only be accomplished by a constitutional

convention. 583 P.2d at 1283–84. The court identified a quantitative and

qualitative analysis for determining the revision or amendment issue. The

quantitative analysis focused on the enactment's "deletion or alteration of numerous

existing provisions" and whether they were "so extensive . . . as to change directly

the '*substantial entirety*' of the Constitution . . . ." *Id.* at 1286 (emphasis added).

The qualitative prong focused on whether a "relatively simple enactment [might]

accomplish such *far reaching* changes in the nature of [the] basic governmental plan

as to amount to a revision . . . ." *Id.* (emphasis added). The court cited as an example an enactment purporting "to vest all judicial power in the Legislature . . . ." *Id.*

[¶107.] Applying its quantitative/qualitative analysis, the *Amador* court found the amendment had no quantitative effect upon existing constitutional provisions despite impacting many of the 33 sections of an article on taxation and assessment procedures. *Id.* In terms of qualitative analysis, the court determined:

> Contrary to petitioners' assertion, however, we are convinced that article XIII A is more modest both in concept and effect and does not change our basic governmental plan. Following the adoption of article XIII A both local and state government will continue to function through the traditional system of elected representation. Other than in the limited area of taxation, the authority of local government to enact appropriate laws and regulations remains wholly unimpaired.

*Id.* at 1288.

[¶108.] The *Amador* court concluded:

> In summary, we believe that it is apparent that article XIII A will result in various substantial changes in the operation of the former system of taxation. Yet, unlike the alterations effected by the *McFadden*[36] initiative discussed above, the article XIII A changes operate functionally within a relatively narrow range to accomplish a new system of taxation which may provide

---

36. In *McFadden v. Jordan*, 196 P.2d 787 (Cal. 1948), the California Supreme Court "struck down an initiative measure which would have added 21,000 words to [the] then existing 55,000-word [state] constitution" dealing with such "subjects as retirement pensions, gambling, taxes, oleomargarine, healing arts, civic centers, senate reapportionment, fish and game, and surface mining." *Amador*, 583 P.2d at 1285. "[T]he proposal would have *repealed or substantially altered* at least 15 of the 25 articles which then comprised the [California] Constitution." *Id.* (emphasis added). The court noted in *McFadden* that the "functions of both the legislative and the judicial branches of . . . state government would [have been] substantially curtailed." 196 P.2d at 796.

> substantial tax relief for our citizens. We decline to hold that
> such a limited purpose cannot be achieved directly by the people
> through the initiative process.

*Id.* at 1289.

[¶109.]     The *Amador* court's quantitative/qualitative analysis comports with the Commission's view of constitutional revision in South Dakota as something far-reaching, complete, comprehensive, and substantial. Thus, *Amador* provides an appropriate framework for resolving whether Amendment A is a revision.

[¶110.]     Here, it is claimed Amendment A, § 6's grant of "exclusive power" to the Department of Revenue infringes on the Legislature's policy prerogatives and ability to delegate authority to other agencies and that this is a far-reaching change to South Dakota's governmental plan constituting a revision. Amendment A, § 6 grants "exclusive power" to the Department to "license and regulate" six areas related to marijuana and to "administer and enforce" the article. The six regulated areas are: "cultivation, manufacture, testing, transport, delivery, and sale . . . ." Amendment A, § 6. The four subdivisions of the section address licensing in these regulated areas. *Id.*

[¶111.]     Amendment A defines the Department as "the Department of Revenue *or its successor agency*" and preserves the Governor's authority to reorganize departments. Amendment A, § 1(1) (emphasis added); S.D. Const. art. IV, § 8; SDCL 1-32-2(11). Despite the use of the word "exclusive" in Amendment A, § 6, the Department remains a department in the executive branch led by a secretary appointed by the Governor with the consent of the Senate. SDCL 1-32-2(11); SDCL 1-47-1.1 to -2; SDCL 10-1-1. The secretary and the Department provide reports to

the Governor and the Legislature. SDCL 10-1-3, -35 to -36. The Governor has budgetary authority over the Department "through the Bureau of Finance and Management . . . ." SDCL 4-7-3. The Governor and Bureau submit budget reports to the Legislature. SDCL 4-7-9.

[¶112.] The Legislature approves the budget by virtue of its appropriation power. S.D. Const. art. XII, § 1, § 2. Amendment A requires the Department to promulgate rules to implement and enforce the article in a timely manner. Amendment A, § 7. Section 12 of Amendment A requires the Department to adopt its rules in compliance "with chapter 1-26 of the South Dakota Codified Laws." Under SDCL chapter 1-26, a legislative committee conducts hearings, reviews rules, and essentially must approve them or "revert" them for further rule-making. SDCL 1-26-1.1 to -1.2, -4.1 to -4.4, -4.7, -4.9. The Legislature has the authority to constitutionally empower the committee to suspend promulgated administrative rules from going into effect for a fixed time. S.D. Const. art. III, § 30. The legislative committee can do so whenever it questions a rule's necessity, constitutionality, authorization, or violation of legislative intent. SDCL 1-26-38.

[¶113.] Section 12 of Amendment A directs that "[a]ny person aggrieved by a decision of the department is entitled to appeal the decision in accordance with chapter 1-26 . . . ." This is in addition to SDCL 10-1-41, which grants a right of appeal to aggrieved persons from the Department's decisions pursuant to SDCL chapter 1-26. SDCL 1-26-30.2 makes the Department's decisions appealable to circuit court. Lastly, under SDCL 1-26-37, there is a right of appeal to this Court from the final judgments of the circuit court in administrative cases.

[¶114.] In summary, although Amendment A specifies an agency responsible for regulating marijuana, it does not eliminate the ability of the executive, legislative, or judicial branches to continue their traditional roles related to that agency. Under *Amador*, the inquiry is whether Amendment A's distribution of authority has a quantitative or qualitative effect on the constitution and our basic governmental plan. 583 P.2d at 1286–89.

[¶115.] The six limited areas of exclusive power granted to the Department by Amendment A do not have a "quantitative effect" upon existing constitutional provisions. *Compare Amador*, 583 P.2d at 1286 (declining to find a quantitative effect in an amendment affecting many of the 33 separate sections of an existing constitutional provision on taxation and assessment procedure), *with McFadden*, 196 P.2d at 796 (holding a proposed initiative measure repealing or *substantially* altering at least 15 of 25 articles in the existing constitution to be an attempted revision). Qualitatively, based upon the Governor's and Legislature's continued oversight of the Department and the opportunity for judicial review of the Department's decisions, Amendment A "does not change our basic governmental plan." *Amador*, 583 P.2d at 1288. *See also McFadden*, 196 P.2d at 796 (holding a measure to be an attempted revision where "the functions of both the legislative and the judicial branches of . . . state government would [have been] substantially curtailed").

[¶116.] It is further claimed that Amendment A, § 5 removes the ability of the Legislature to enact civil penalties for non-criminal marijuana violations and that this changes South Dakota's basic governmental plan. Amendment A, § 5 provides

five civil penalties for non-criminal cultivation infractions, smoking offenses, underage possession, and use and distribution violations. The maximum penalty is two hundred fifty dollars. Amendment A, § 5. Quantitatively, five civil penalties with a maximum of two hundred fifty dollars do not amount to "deletion or alteration of numerous existing provisions" nor are they "so extensive . . . as to change directly the 'substantial entirety' of the Constitution . . . ." *Amador*, 583 P.2d at 1286. In terms of qualitative effect, the civil penalties are a limited incursion on the Legislature's ability to enact such penalties, but are not "far reaching changes . . . ." *Id.* They do not approach the *Amador* example of a qualitative change; *i.e.*, an enactment purporting "to vest all judicial power in the Legislature . . . ." *Id.* To the contrary, they are modest "in concept and effect and [do] not change our basic governmental plan." *Id.* at 1288.

[¶117.] Next, it is claimed that Amendment A establishes a new cause of action against the Department for failing to promulgate rules in a timely manner and violating the Legislature's power under S.D. Const. art. III, § 27 to "direct by law in what manner and in what courts suits may be brought against the state." Amendment A, § 12 sets forth a time limit for the Department to exercise its rule-making responsibilities under the amendment and makes a mandamus action available as a remedy if the Department fails to do so or adopts rules inconsistent with Amendment A.

[¶118.] Rule-making must comply with SDCL chapter 1-26, which essentially requires approval of the rules by a legislative committee. Amendment A, § 12; SDCL 1-26-4.7, -4.9. Mandamus is not a new cause of action; it was available at

common law and has been broadened by statute. *Smith v. Otter Tail Power Co.*, 80 S.D. 327, 330, 123 N.W.2d 169, 170 (1963). It may be used to "compel the performance of an act which the law specially enjoins as a duty . . . ." *Id.*; SDCL 21-29-1. *Accord Sorensen v. Sommervold*, 2005 S.D. 33, ¶ 9, 694 N.W.2d 266, 269 (noting "mandamus may be used to compel [a] duty"). Clarifying the availability of mandamus relief for the Department's failure to promulgate rules in a timely manner under Amendment A does not change the "'substantial entirety' of the [c]onstitution" or "accomplish such far reaching changes in the nature of [the] basic governmental plan as to amount to a revision . . . ." *Amador*, 583 P.2d at 1286.

[¶119.]　　　　Lastly, it is claimed that Amendment A's overall abdication or delegation of legislative authority and reallocation of authority among branches of government makes far-reaching changes to South Dakota's government plan constituting a revision. Miller complains that these changes are "comprehensive" and "enshrined into the Constitution" and that the constitution is not the place for them.[37] But that is the point.

---

37.　　After its years of study, the Commission viewed it differently. In its 1971 recommendations for the amendment of Article XXIII, § 1, the Commission clarified that a single amendment could encompass more than one article:

> The proposal clearly allows an amendment to accomplish multiple objectives, to involve related subject matter, and to amend more than one article. The proposed section is not so broad as to permit proposal of an entire new Constitution in one amendment (a situation conceivable under the United States Constitution), but it is broad enough to permit *comprehensive* revision by the amending process.

*Commission Recommendations*, at 69 (emphasis added).

[¶120.]    "The Constitution is the mother law . . . not the baby." *Davis*, 2011 S.D. 51, ¶ 76, 804 N.W.2d at 643 (Gilbertson, C.J., concurring in result) (quoting *Poppen v. Walker*, 520 N.W.2d 238, 242 (S.D. 1994)). "[U]nder our system of government the powers of government are derived from the people." *Brendtro*, 2006 S.D. 71, ¶ 22, 720 N.W.2d at 678. Although the constitution originally granted legislative power to the Legislature without reservation, the amendment approving the initiative was approved in 1898 in which "the people expressly reserved to themselves 'the right to propose measures' . . . ." *Id.* ¶¶ 23, 26, 720 N.W.2d at 678–79. In 1972, this right was extended to constitutional amendments. S.D. Const. art. XXIII, § 1, Historical Notes. "The Legislature's power is only concurrent with the power of the people to initiate a law on any subject." *Brendtro*, 2006 S.D. 71, ¶ 29, 720 N.W.2d at 680 (quoting *State v. Pyle*, 55 S.D. 269, 272, 226 N.W. 280, 281 (1929)).

[¶121.]    "The purpose of the initiative is not to curtail or limit legislative power to enact laws, but rather to compel enactment of measures desired by the people, and to empower the people, in the event the legislature fails to act, to enact such measures themselves." *Id.* (quoting *Byre*, 362 N.W.2d at 79).[38] "[T]he reserved

---

38.    Although the *Byre* quote was questioned in *Brendtro*, 2006 S.D. 71, ¶ 29 n.9, 720 N.W.2d at 680 n.9, it was questioned because it was used to argue that the initiative was limited and available "*only* where the legislature [had] not acted . . . ." *Id.* ¶ 30, 720 N.W.2d at 680 (emphasis added). This Court rejected that view because it would have made the initiative insignificant. *Id.* ¶ 33. Moreover, the Court made clear at the beginning of the opinion that the initiative represented "the people's 'right to propose measures' . . . ." *Id.* ¶ 15, 720 N.W.2d at 675 (citing S.D. Const. art. III, § 1). Other courts have made similar observations. *See Baird v. Burke Cnty.*, 205 N.W. 17, 20 (N.D. 1925) ("By the initiative, the people have provided against nonaction by their

(continued . . .)

power[ ] of initiative . . . [is] not [to be] strictly construed." *Id.* ¶ 33, 720 N.W.2d at 681.

[¶122.]     Considering the Commission's expansive view of constitutional revision as evaluated according to *Amador's* quantitative and qualitative analysis, Amendment A's limited reallocation of power from the Governor and the Legislature to the Department by initiative is not a far-reaching change "in the nature of [the] basic governmental plan." *Amador*, 583 P.2d at 1286.  Instead, it is part of it.  Therefore, I would hold that it is not a revision required to be submitted by a constitutional convention.  *Id.*

_____

(. . . continued)
    duly constituted representatives in the legislative branch . . . ."); *Amador*, 583
    P.2d at 1289 (noting the initiative was designed for use "where the ordinary
    machinery of legislation" had failed).  Thus, the *Byre* quote is applicable here.

## Appendix A

### INITIATED CONSTITUTIONAL AMENDMENT A

That the Constitution of the State of South Dakota be amended to add a new Article to read as follows:

§ 1  Terms used in this article mean:
  (1)  "Department," the Department of Revenue or its successor agency;
  (2)  "Hemp," the plant of the genus cannabis, and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not with a delta-9 tetrahydrocannabinol concentration of not more than three-tenths of one percent on a dry weight basis;
  (3)  "Local government," means a county, municipality, town or township;
  (4)  "Marijuana," the plant of the genus cannabis, and any part of that plant, including, the seeds, the resin extracted from any part of the plant, and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds, or its resin, including hash and marijuana concentrate.  The term includes an altered state of marijuana absorbed into the human body.  The term does not include hemp, or fiber produced from the stalks, oil or cake made from the seeds of the plant, sterilized seed of the plant which is incapable of germination, or the weight of any other ingredient combined with marijuana to prepare topical or oral administrations, food, drink, or other products;
  (5)  "Marijuana accessory," any equipment, product, material, which is specifically designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, ingesting, inhaling, or otherwise introducing marijuana into the human body.

§ 2  Notwithstanding the provisions of this article, this article does not limit or affect laws that prohibit or otherwise regulate:
  (1)  Delivery or distribution of marijuana accessories, with or without consideration, to a person younger than twenty-one years of age;
  (2)  Purchase, possession, use, or transport of marijuana accessories by a person younger than twenty-one years of age;
  (3)  Consumption of marijuana by a person younger than twenty-one years of age;

(4) Operating or being in physical control of any motor vehicle, train, aircraft, motorboat, or other motorized form of transport while under the influence of marijuana;

(5) Consumption of marijuana while operating or being in physical control of a motor vehicle, train, aircraft, motorboat, or other motorized form of transport, while it is being operated;

(6) Smoking marijuana within a motor vehicle, aircraft, motorboat, or other motorized form of transport, while it is being operated;

(7) Possession or consumption of marijuana or possession of marijuana accessories on the grounds of a public or private preschool, elementary school, or high school, in a school bus, or on the grounds of any correctional facility;

(8) Smoking marijuana in a location where smoking tobacco is prohibited;

(9) Consumption of marijuana in a public place, other than in an area licensed by the department for consumption;

(10) Consumption of marijuana as part of a criminal penalty or diversion program;

(11) Conduct that endangers others;

(12) Undertaking any task under the influence of marijuana, if doing so would constitute negligence or professional malpractice; or

(13) Performing solvent-based extractions on marijuana using solvents other than water, glycerin, propylene glycol, vegetable oil, or food grade ethanol, unless licensed for this activity by the department.

§ 3     Notwithstanding the provisions of this article, this article does not:

(1) Require that an employer permit or accommodate conduct allowed by this article;

(2) Affect an employer's ability to restrict the use of marijuana by employees;

(3) Limit the right of a person who occupies, owns, or controls private property from prohibiting or otherwise regulating conduct permitted by this article on or in that property; or

(4) Limit the ability of the state or local government to prohibit or restrict any conduct otherwise permitted under this article within a building owned, leased, or occupied by the state or local government.

§ 4     Subject to the limitations in this article, the following acts are not unlawful and shall not be an offense under state law or the laws of any local government within the state or be subject to a civil fine, penalty, or sanction, or be a basis for detention, search, or arrest, or to deny any right or privilege, or to seize or forfeit assets under state law or the laws of any local government, if the person is at least twenty-one years of age:

(1) Possessing, using, ingesting, inhaling, processing, transporting, delivering without consideration, or distributing without consideration one ounce or less of marijuana, except that not more than eight grams of marijuana may be in a concentrated form;

(2) Possessing, planting, cultivating, harvesting, drying, processing, or manufacturing not more than three marijuana plants and possessing the marijuana produced by the plants, provided:

    (a) The plants and any marijuana produced by the plants in excess of one ounce are kept at one private residence, are in a locked space, and are not visible by normal, unaided vision from a public place;

    (b) Not more than six plants are kept in or on the grounds of a private residence at one time; and

    (c) The private residence is located within the jurisdiction of a local government where there is no licensed retail store where marijuana is available for purchase pursuant to this article.

(3) Assisting another person who is at least twenty-one years of age, or allowing property to be used, in any of the acts permitted by this section; and

(4) Possessing, using, delivering, distributing, manufacturing, transferring, or selling to persons twenty-one years of age or older marijuana accessories.

§ 5

(1) A person who, pursuant to § 4 of this article, cultivates marijuana plants that are visible by normal, unaided vision from a public place is subject to a civil penalty not exceeding two-hundred and fifty dollars.

(2) A person who, pursuant to § 4 of this article, cultivates marijuana plants that are not kept in a locked space is subject to a civil penalty not exceeding two-hundred and fifty dollars.

(3) A person who, pursuant to § 4 of this article, cultivates marijuana plants within the jurisdiction of a local government where marijuana is available for purchase at a licensed retail store is subject to a civil penalty not exceeding two-hundred and fifty dollars, unless the cultivation of marijuana plants is allowed through local ordinance or regulation pursuant to § 10.

(4) A person who smokes marijuana in a public place, other than in an area licensed for such activity by the department, is subject to a civil penalty not exceeding one-hundred dollars.

(5) A person who is under twenty-one years of age and possesses, uses, ingests, inhales, transports, delivers without consideration or distributes without consideration one ounce or less of marijuana or possesses, delivers without consideration, or distributes without consideration marijuana accessories is subject

to a civil penalty not to exceed one-hundred dollars.  The person shall be provided the option of attending up to four hours of drug education or counseling in lieu of the fine.

§ 6    The department shall have the exclusive power, except as otherwise provided in § 10, to license and regulate the cultivation, manufacture, testing, transport, delivery, and sale of marijuana in the state and to administer and enforce this article.  The department shall accept applications for and issue, in addition to any other types of licenses the department deems necessary:

(1)    Licenses permitting commercial cultivators and manufacturers of marijuana to cultivate, process, manufacture, transport, and sell marijuana to marijuana wholesalers;

(2)    Licenses permitting independent marijuana testing facilities to analyze and certify the safety and potency of marijuana;

(3)    Licenses permitting marijuana wholesalers to package, process, and prepare marijuana for transport and sale to retail sales outlets; and

(4)    Licenses permitting retail sales outlets to sell and deliver marijuana to consumers.

§ 7    Not later than April 1, 2022, the department shall promulgate rules and issue regulations necessary for the implementation and enforcement of this article.  The rules shall be reasonable and shall include:

(1)    Procedures for the issuance, renewal, suspension, and revocation of licenses;

(2)    Application, licensing, and renewal fees, not to exceed the amount necessary to cover the costs to the department of implementing and enforcing this article;

(3)    Time periods, not to exceed ninety days, by which the department must issue or deny an application

(4)    Qualifications for licensees;

(5)    Security requirements, including lighting and alarm requirements, to prevent diversion;

(6)    Testing, packaging, and labeling requirements, including maximum tetrahydrocannabinol levels, to ensure consumer safety and accurate information;

(7)    Restrictions on the manufacture and sale of edible products to ensure consumer and child safety;

(8)    Health and safety requirements to ensure safe preparation and to prohibit unsafe pesticides;

(9)    Inspection, tracking, and record-keeping requirements to ensure regulatory compliance and to prevent diversion;

(10)   Restrictions on advertising and marketing;

(11) Requirements to ensure that all applicable statutory environmental, agricultural, and food and product safety requirements are followed;

(12) Requirements to prevent the sale and diversion of marijuana to persons under twenty-one years of age; and

(13) Civil penalties for the failure to comply with rules adopted pursuant to this article.

§ 8    In determining the appropriate number of licenses to issue, as required under this article, the department shall:

(1) Issue enough licenses to substantially reduce the illicit production and sale of marijuana throughout the state; and

(2) Limit the number of licenses issued, if necessary, to prevent an undue concentration of licenses in any one municipality.

§ 9    Actions and conduct by a licensee, a licensee's employee, and a licensee's agent, as permitted pursuant to a license issued by the department, or by those who allow property to be used by a licensee, a licensee's employee, or a licensee's agent, as permitted pursuant to a license issued by the department, are not unlawful and shall not be an offense under state law, or the laws of any local government within the state, or be subject to a civil fine, penalty, or sanction, or be a basis for detention, search, or arrest, or to deny any right or privilege, or to seize or forfeit assets under state law, or the laws of any local government within the state.  No contract is unenforceable on the basis that marijuana is prohibited by federal law.  A holder of a professional or occupational license is not subject to professional discipline for providing advice or services related to marijuana licensees or applications on the basis that marijuana is prohibited by federal law.

§ 10   A local government may enact ordinances or regulations governing the time, place, manner, and number of licenses operating within its jurisdiction.  A local government may ban the establishment of licensees or any category of licensee within its jurisdiction.  A local government may allow for cultivation at private residences within its jurisdiction that would otherwise not be allowed under § 4(2)(c) so long as the cultivation complies with § 4(2)(a) and § 4(2)(b) and the other requirements of this article.  A local government may not prohibit the transportation of marijuana through its jurisdiction on public roads by any person licensed to do so by the department or as otherwise allowed by this article.

§ 11   An excise tax of fifteen percent is imposed upon the gross receipts of all sales of marijuana sold by a person licensed by the department pursuant to this article to a consumer.  The Legislature may adjust this rate after November 3, 2024.  The department shall by rule

establish a procedure for the collection of this tax and shall collect the tax. The revenue collected under this section shall be appropriated to the department to cover costs incurred by the department in carrying out its duties under this article. Fifty percent of the remaining revenue shall be appropriated by the Legislature for the support of South Dakota public schools and the remainder shall be deposited into the state general fund.

§ 12    Any rule adopted by the department pursuant to this article must comply with chapter 1-26 of the South Dakota Codified Laws. Any person aggrieved by a decision of the department is entitled to appeal the decision in accordance with chapter 1-26 of the South Dakota Codified Laws. If by April 1, 2022, the department fails to promulgate rules required by this article, or if the department adopts rules that are inconsistent with this article, any resident of the state may commence a mandamus action in circuit court to compel performance by the department in accordance with this article.

§ 13    The department shall publish an annual report that includes the number and types of licenses issued, demographic information on licensees, a description of any enforcement or disciplinary action taken against licensees, a statement of revenue and expenses of the department related to the implementation, administration, and enforcement of this article, and a statement of taxes collected in accordance with this article, and an accounting for how those revenues were disbursed.

§ 14    Not later than April 1, 2022, the Legislature shall pass laws to
    (1)    Ensure access to marijuana beyond what is set forth in this article by persons who have been diagnosed by a health care provider, acting within the provider's scope of practice, as having a serious and debilitating medical condition and who are likely to receive therapeutic or palliative benefit from marijuana; and
    (2)    Regulate the cultivation, processing, and sale of hemp.

§ 15    This article shall be broadly construed to accomplish its purposes and intents. Nothing in this article purports to supersede any applicable federal law, except where allowed by federal law. If any provision in this article or the application thereof to any person or circumstance is held invalid or unconstitutional, such invalidity or unconstitutionality shall not affect other provisions or applications of the article that can be given effect without the invalid or unconstitutional provisions or application, and to this end the provisions of this article are severable.

# Appendix B

## CONSTITUTIONAL AMENDMENT

## ATTORNEY GENERAL'S STATEMENT

<u>Title:</u>  An amendment to the South Dakota Constitution to legalize, regulate, and tax marijuana; and to require the Legislature to pass laws regarding hemp as well as laws ensuring access to marijuana for medical use.

<u>Explanation:</u>

This constitutional amendment legalizes the possession, use, transport, and distribution of marijuana and marijuana paraphernalia by people age 21 and older. Individuals may possess or distribute one ounce or less of marijuana. Marijuana plants and marijuana produced from those plants may also be possessed under certain conditions.

The amendment authorizes the State Department of Revenue ("Department") to issue marijuana-related licenses for commercial cultivators and manufacturers, testing facilities, wholesalers, and retailers. Local government may regulate or ban the establishment of licensees within their jurisdictions.

The Department must enact rules to implement and enforce this amendment. The amendment requires the Legislature to pass laws regarding medical use of marijuana. The amendment does not legalize hemp; it requires the Legislature to pass laws regulating the cultivation, processing, and sale of hemp.

The amendment imposes a 15% tax on marijuana sales. The tax revenue will be used for the Department's costs incurred in implementing this amendment, with remaining revenue equally divided between the support of public schools and the State general fund.

Judicial clarification of the amendment may be necessary. The amendment legalizes some substances that are considered felony controlled substances under current State law. Marijuana remains illegal under Federal law.